## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| VICTOR LAMOND JORDAN, SR., <br>     *Plaintiff*, <br><br>      v. <br><br> ROLLIN COOK, et al., <br>     *Defendants*. | No. 3:20-cv-00491 (VAB) |

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Victor Lamond Jordan, Sr. ("Plaintiff"), currently incarcerated, filed a Complaint *pro se*, under 42 U.S.C. § 1983, challenging his conditions of confinement and asserting a claim for denial of due process. Compl., ECF No. 1 (Apr. 13, 2020) ("Compl."). The remaining Defendants,[1] Commissioner Rollin Cook, Warden Roger Bowles, Warden Guiliana Mudano, Deputy Warden Solomon Baymon, Deputy Commissioner Angel Quiros, Director of Population Management David Maiga, Captain Gregorio Robles, Captain Darren Chevalier, and Psychologist Mueller (collectively, "Defendants"), have filed a motion for summary judgment.

For the following reasons, the Court **GRANTS** Defendants' motion for summary judgment.

---

[1] The Court uses the titles of the Defendants at the time of the incidents underlying the Complaint.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**[2, 3]

   A.  **Factual Background**

Mr. Jordan, who is serving an eighty-one year sentence "for multiple offenses," has been incarcerated since April 2008. Compl. ¶ 39; Defs.' Rule 56(a)(1) Statement of Undisputed Material Facts ¶¶ 6–7, ECF No. 52-2 (Mar. 24, 2021) ("Defs.' 56(a) Statement"). On May 31, 2019, after an incident at MacDougall-Walker Correctional Institution ("MWCI"), state prison officials had Mr. Jordan transferred to Northern Correctional Institution ("Northern"). Prison officials transferred Mr. Jordan to Northern and placed him in restrictive housing because of the incident at MWCI. Compl. ¶¶ 40–41; Defs.' 56(a) Statement ¶¶ 28, 30.

On June 7, 2019, prison officials informed Mr. Jordan of a hearing to be held on June 12, 2019 "to determine whether his continued presence in general population presented a threat to the safety and security of the institutional community due to repetitive disciplinary infractions and/or involvement in a serious incident." Defs.' 56(a) Statement ¶ 29; *see also* Compl. ¶ 45 (stating that on June 3, 2019, Mr. Jordan "was transferred from [m]edical [c]ell . . . pending placement [h]earing for Administrative-Segregation (A/S)"). The notice explained that:

> On May 30, 2019 in "O" Unit at MacDougall Correctional
> Institution, staff was conducting a random shakedown of your cell

---

[2] The factual allegations are taken from Defendants' Local Rule 56(a) Statements and supporting exhibits. Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)(1) Statement and indicating whether the opposing party admits or denies the facts set forth by the moving party. D. Conn. L. Civ. R. 56(a)(3).Each admission or denial must include a specific citation to an affidavit or other admissible evidence. *Id.*

Mr. Jordan denies many facts included in Defendants' Local Rule 56(a)(1) Statement. The Court has reviewed the evidence cited by both parties in determining which facts to include here. Any statements for which Mr. Jordan has not provided a citation to admissible evidence are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)(1) ("All material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Rule 56(a)(2).").

[3] Mr. Jordan filed his Complaint on April 13, 2020. As Mr. Jordan has not sought to supplement his Complaint, this action concerns only events occurring before that date. Although the parties include many facts occurring after Mr. Jordan commenced this action, those facts are not addressed in this Ruling and Order.

> (O Unit-29 cell). During the shakedown, staff discovered a contraband item and addressed you and your cellmate about them. You entered the cell, became agitated and yelled for Lieutenants to respond. A code was called requesting additional staff assistance. You proceeded to remove all of your clothes and advanced at staff. You utilized your cane as a weapon in your right hand and were striking staff with your left hand. It took several members to restrain you and gain compliance. As a result of your actions, several staff members were sent to an outside medical facility due to injuries.

Defs.' 56(a) Statement ¶ 30. Although Mr. Jordan disputes the accuracy of the description of the incident, *see* Decl. of Victor Lamond Jordan Sr. at 8–11, ECF No. 53-1 (Apr. 12, 2021) ("Pl.'s Decl. re May 30"), he does not dispute that the notice included the quoted language above. Local Rule 56(a)(2) Statement ¶ 30, ECF No. 53 (Apr. 12, 2021) ("Pl.'s 56(a) Statement").

Mr. Jordan chose CTO Sessions to be his advisor for the hearing and gave him a statement on June 10, 2019 describing his version of the incident. Defs.' 56(a) Statement ¶¶ 31–32. Mr. Jordan attended a hearing on June 14, 2019 with his advisor. *Id.* ¶ 33. CCS Tugie presided over the hearing. *Id.* Mr. Jordan told CCS Tugie, "I am not doing a program. I asked to be here. I just want to be left alone. The statement to my advisor speaks for itself. I have nothing else." *Id.* ¶ 34.

CCS Tugie recommended placement on Administrative Segregation status based on intentional assault on staff. *Id.* ¶ 35. Mr. Jordan again denies the accuracy of the reported version of the incident. Pl.'s Decl. re May 30 ¶ 35.

On June 12, 2019, Mr. Jordan wrote to Warden Mudano, expressed his unwillingness to complete the Administrative Segregation Program, and requested Special Needs placement. Defs.' 56(a) Statement ¶ 110. Deputy Warden Robles responded to the letter, and informed Mr. Jordan that he had to first complete the Administrative Segregation Program. *Id.* ¶ 111.

Director Maiga approved the placement on June 19, 2019. *Id.* ¶ 36. Mr. Jordan received

notice of the decision on June 20, 2019, but refused to sign the acknowledgment of notice. *Id.* ¶ 37.

Mr. Jordan entered Phase 1 of the Administrative Segregation Program (the "Program"), where he was subjected to restrictive housing conditions. *Id.* ¶ 38. On September 25, 2019, Mr. Jordan was recommended to progress to Phase 2 of the Program. *Id.* ¶ 39. On October 31, 2019, a bed became available in Phase 2 of the Program at Garner Correctional Institution. *Id.* ¶ 40. Mr. Jordan refused this housing, and so prison officials placed him back in Phase 1. *Id.* Mr. Jordan denies having refused housing, but does not contest having been regressed to Phase 1. Pl.'s 56(a) Statement ¶ 40. In November 2019, prison officials again recommended Mr. Jordan for advancement to Phase 2. Defs.' 56(a) Statement ¶ 41.

While at Northern, Mr. Jordan had access to and received medical, dental, and mental health treatment. *Id.* ¶ 48. Mr. Jordan disputes the adequacy of the care provided. Pl.'s 56(a) Statement ¶ 48.

On June 13, 2019, Mr. Jordan filed a grievance and complained about not having received treatment for the injuries sustained in the May 30, 2019 incident. Defs.' 56(a) Statement ¶ 66. On July 2, 2019, prison officials disposed of the grievance as a "change in treatment" and had Mr. Jordan evaluated in the medical unit. *Id.* ¶ 67. On July 16, 2019, Mr. Jordan filed a grievance and complained about the medical treatment provided by Dr. Clements on July 2, 2019. *Id.* ¶ 68; Attach. 16 to Defs.' Mot. for Summ. J. at 9, ECF No. 52-17 (Mar. 24, 2021) ("Attach. 16"). Prison officials disposed of the grievance "as resolved since specialty care was submitted for approval." Defs.' 56(a) Statement ¶ 69.

On June 28, 2019, Mr. Jordan again filed a grievance regarding staff misconduct in connection with the May 30, 2019 incident. *Id.* ¶ 97. Prison officials denied the grievance on July

26, 2019, and noted that there was no evidence to support Mr. Jordan's claims. *Id.* ¶ 98. Mr. Jordan appealed the denial on August 6, 2019, claiming that "DOC is trying to cover up a clear violation of [his] civil rights." *Id.* ¶ 99. Prison officials denied the appeal, concluding that the incident "was thoroughly reviewed and [Mr. Jordan's] claim of staff misconduct is without merit." *Id.* ¶ 100; Attach. 10 to Defs.' Mot. for Summ. J. at 6, ECF No. 52-11 (Mar. 24, 2021). On September 9, 2019, Mr. Jordan's grievance and appeal regarding video preservation of the May 30, 2019 incident also were denied. Defs.' 56(a) Statement ¶ 101.

On July 27, 2019, Mr. Jordan filed a grievance regarding the professional conduct of a nurse, alleging that she falsified his medical chart upon his admission to Northern. *Id.* ¶ 70. Prison officials denied the grievance because Mr. Jordan had to complete "a specific form" to change his medical records. *Id.* ¶ 71; *see also* Attach. 16 at 7 (indicating that Mr. Jordan needed to fill out a "HR303A form"). Mr. Jordan appealed the resolution and claimed a conspiracy between custody and medical staff regarding the May 30, 2019 incident. Defs.' 56(a) Statement ¶ 72. Mr. Jordan later completed the required form to change his medical records. *Id.* ¶ 73.

Mr. Jordan filed a grievance on October 23, 2019 and an appeal on December 9, 2019 concerning conditions of confinement at Northern. *Id.* ¶ 103. The grievance and appeal were denied on December 5, 2019 and December 23, 2019, respectively, as untimely filed because Mr. Jordan had been confined under the conditions complained of since May 31, 2019, which was beyond the 30-day time frame by which grievances must be filed. *Id.*; Attach. 11 to Defs.' Mot. for Summ. J. at 28, ECF No. 52-12 (Mar. 24, 2021) ("Attach. 11").

On November 4, 2019, Dr. Mueller responded to a mental health request from Mr. Jordan, dated October 31, 2019, concerning an ongoing fear for his safety following the May 30, 2019 incident. Defs.' 56(a) Statement ¶ 62.

On March 23, 2020, Mr. Jordan's November 2019 grievance and February 5, 2020 appeal regarding advancement to Phase 2 of Administrative Segregation were initially denied and then compromised. *Id.* ¶ 104. The decision noted that inmate concerns for safety and security were considered seriously, that the disciplinary report for refusing housing had been dismissed, and that a protective custody package had been initiated for Mr. Jordan. *Id.*

On June 18, 2020, the Department of Corrections ("DOC") "rejected as untimely filed" Mr. Jordan's April 7, 2020 administrative remedies form and May 21, 2020 appeal concerning conditions of confinement in Administrative Segregation, because Mr. Jordan had been confined under the conditions complained of since May 31, 2019, which was beyond the 30-day time frame by which grievances must be filed. *Id.* ¶ 105. Mr. Jordan "disputes that his time to file was up to grieve an ongoing offense." Pl.'s 56(a) Statement ¶ 105.

On July 24, 2020, Mr. Jordan "wrote an inmate request to [ ] Warden Bowles and [ ] Deputy Warden Baymon concerning mental health care by a nurse and not a member of the mental health staff." Defs.' 56(a) Statement ¶ 114. Warden Bowles replied that "a nurse saw [Mr. Jordan] because mental health staff was not available at that time." *Id.* ¶ 115.

On September 11, 2020, the DOC denied and rejected Mr. Jordan's May 28, 2020 administrative remedies form and August 20, 2020 appeal concerning "lack of care or inadequate mental health treatment . . . ." *Id.* ¶ 107; Attach. 11 at 71.

Although Mr. Jordan alleges that he submitted request forms, dated October 29, 2019, to Defendants Chevalier and Robles, Defendants have been unable to locate any requests from that date. Defs.' 56(a) Statement ¶ 120. Mr. Jordan has submitted a purported copy of the request, but there is no indication that it was sent or received. Ex. C to Pl.'s Mot. in Opp'n of Defs.' Summ. J. Mot. at 64-65, ECF No. 53-3 (Apr. 12, 2021) ("Ex. C").

Mr. Jordan remained at Northern until his arrival at Cheshire Correctional Institution on October 20, 2020.[4] Defs.' 56(a) Statement ¶¶ 8–9.

### B. Procedural History

On April 13, 2020, Mr. Jordan filed his Complaint against Defendants in the United States District Court for the District of Connecticut. Compl.

On May 21, 2020, United States District Court Judge Dominic J. Squatrito issued an Initial Review Order dismissing Mr. Jordan's equal protection claims and all claims against APRN Andrea Reischerl. Initial Review Order, ECF No. 7 (May 21, 2020).

On July 7, 2020, Mr. Jordan filed his first motion for preliminary injunctive relief claiming that his medical and mental health needs were not being met. Mot. for a TRO and a Prelim. Inj., ECF No. 18 (July 7, 2020).

On July 24, 2020, Defendants filed an Answer with affirmative defenses. Answer and Affirmative Defenses, ECF No. 24 (July 24, 2020).

On July 27, 2020, Defendants filed an objection to Mr. Jordan's first motion for preliminary injunctive relief. Defs.' Obj. to Pl.'s Mot. for TRO and Prelim. Inj., ECF No. 25 (July 27, 2020).

On August 3, 2020, Mr. Jordan filed a reply to Defendants' objection. Pl.'s Resp. to Defs.' Obj. to Mot. for TRO and Prelim. Inj. by Pl., ECF No. 29 (Aug. 3, 2020).

On August 18, 2020, Mr. Jordan filed a second motion for preliminary injunctive relief claiming that Psychologist Mueller and Social Worker Eddie Gonzalez failed to take action when

---

[4] Mr. Jordan states in his memorandum filed on April 16, 2021 that he is confined at Northern under harsh conditions. *See* Pl.'s Mot. in Opp'n to Defs.' Summ. J. Mot. at 23, ECF No. 53 (Apr. 12, 2021) ("Pl.'s Opp'n"). However, he filed a notice of change of address stating that he was transferred to Cheshire Correctional Institution on October 13, 2020. *See* Notice of Change of Address, ECF No. 41 (Feb. 10, 2021).

he informed them that he and Social Worker Patricia Saltzman were engaged in an inappropriate sexual relationship. [Mot.] for TRO and Prelim. Inj., ECF No. 32 (Aug. 18, 2020).

On August 28, 2020, Judge Squatrito denied Mr. Jordan's first motion for preliminary injunctive relief. Ruling on Mot. for Prelim. Inj. Relief, ECF No. 34 (Aug. 28, 2020).

On October 7, 2020, Judge Squatrito denied Mr. Jordan's second motion for preliminary injunctive relief. Ruling on Mot. for Prelim. Inj. Relief., ECF No. 35 (Oct. 7, 2020).

On November 25, 2020, Defendants filed an amended answer. Defs.' Am. Answer and Affirmative Defenses, ECF No. 38 (Nov. 25, 2020).

On January 22, 2021, the case was transferred to this Court. Order of Transfer, ECF No. 40 (Jan. 22, 2021).

On March 24, 2021, Defendants filed a motion for summary judgment. Defs.' Mot. for Summ. J., ECF No. 52 (Mar. 24, 2021) ("Defs.' Mot."); Defs.' Mem. of Law in Supp. of Summ. J., ECF No. 52-1 (Mar. 24, 2021) ("Defs.' Mem.").

On April 12, 2021, Mr. Jordan filed an opposition to Defendants' motion for summary judgment. Pl.'s Opp'n.

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967)).

Although the court is required to read a self-represented party's papers "liberally 'to raise the strongest arguments that they suggest,'" *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015)

(quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)), "unsupported allegations do not

create a material issue of fact" and do not overcome a properly supported motion for summary

judgment, *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## III.   DISCUSSION

The remaining claims in this case are an Eighth Amendment conditions of confinement

claim and a Fourteenth Amendment procedural due process claim.

Defendants move for summary judgment on three grounds: (1) Mr. Jordan failed to

exhaust his administrative remedies properly before commencing this action; (2) Mr. Jordan

failed to state a cognizable claim for supervisory liability, and (3) Mr. Jordan received due

process in connection with his Administrative Segregation status.[5]

The Court will address these arguments in turn, to the extent necessary.

### A.  The Failure to Exhaust Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal

lawsuit to exhaust available administrative remedies before a court may hear their case. *See* 42

U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to

prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any

jail, prison, or other correctional facility until such administrative remedies as are available are

exhausted"); *see also Ross v. Blake*, 578 U.S. 632, 632–36 (2016) (applying the PLRA and

noting that it "mandates that an inmate exhaust 'such administrative remedies as are available'

before bringing suit to challenge prison conditions" (quoting 42 U.S.C. § 1997e(a))). "[T]he

PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they

---

[5] As noted in the Initial Review Order, "[Mr.] Jordan has filed another case, Jordan v. Gifford, No. 3:19-cv-1628 ([CSH]), in which he challenges the procedures used to place him in Administrative Segregation. This case, therefore, does not include any due process challenge to [Mr.] Jordan's initial placement." Initial Review Order, ECF No. 7 (May 21, 2020).

involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion"; the inmate must use all steps required by the administrative review process applicable to the institution in which he is confined and do so properly. *See Jones v. Bock*, 549 U.S. 199, 218 (2007) ("In *Woodford*, we held that to properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,' . . . rules that are defined not by the PLRA, but by the prison grievance process itself." (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006))); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out and doing so properly" (quoting *Woodford*, 548 U.S. at 90)). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (internal citation omitted)).

The Supreme Court has held that the requirement for proper exhaustion is not met when a grievance is not filed in accordance with the deadlines established by the administrative "grievance policy." *Jones*, 549 U.S. at 217–18 (citing *Woodford*, 548 U.S. at 93–95). Administrative remedies must also be exhausted before the inmate files a lawsuit. *Baez v. Kahanowicz*, 278 F. App'x 27, 29 (2d Cir. 2008) (summary order) ("Exhaustion of administrative remedies must be completed before filing suit."). Completing the exhaustion process after the complaint is filed does not satisfy the exhaustion requirement. *See Neal v. Goord*, 267 F.3d 116, 122–23 (2d Cir. 2001) (agreeing with the view of other circuits which "held that exhausting administrative remedies after a complaint is filed will not save a case from

dismissal").

Special circumstances will not relieve an inmate of his obligation to comply with the exhaustion requirement. An inmate's failure to exhaust administrative remedies is only excusable if the remedies are, in fact, unavailable. *See Ross*, 578 U.S. at 642 ("Under § 1997e(a), the exhaustion requirement hinges on the availability of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." (internal citation and quotation marks omitted)). The Supreme Court has determined that "availability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (internal citation and quotation marks omitted).

The Supreme Court in *Ross* identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 643–44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 643. "Next, an administrative remedy scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. The Second Circuit has noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive . . . ." *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016). In considering the issue of availability, however, the Court is guided by these illustrations. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) ("The Supreme Court described three scenarios in which administrative procedures

could be 'officially on the books,' but 'not capable of use to obtain relief,' and therefore unavailable. While not exhaustive, these illustrations nonetheless guide the Court's inquiry." (quoting *Ross*, 578 U.S. at 643)).

Exhaustion of administrative remedies is an affirmative defense. Thus, Defendants bear the burden of proof. *See Jones*, 549 U.S. at 216 ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Once Defendants establish that administrative remedies were not exhausted before the inmate commenced the action, Plaintiff must establish that administrative remedy procedures were not available to him under *Ross*, or present evidence showing that he did exhaust his administrative remedies. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) ("[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion, unavailability, estoppel, or special circumstances." (internal citation and quotation marks omitted)).

The general inmate grievance procedure is set forth in Administrative Directive 9.6.[6] This procedure is applicable to Mr. Jordan's Eighth Amendment conditions claims. An inmate first must attempt to resolve the matter informally. He may attempt to verbally resolve the issue with an appropriate staff member or supervisor. Admin. Directive 9.6(6)(A). If attempts to resolve the matter verbally are not effective, the inmate must make a written attempt using CN 9601, Inmate

---

[6] The current Administrative Directive 9.6 became effective on April 30, 2021. Admin. Directive Chapter 9 Classification, Conn. State Dep't of Corr., https://portal.ct.gov/DOC/AD/AD-Chapter-9. This Order cites to the version of the Administrative Directive, as provided in Attachment 9 to Defendants' motion for summary judgment, *see* Attach. 9 to Defs.' Mot. for Summ. J., ECF No. 52-10 (Mar. 24, 2021), that was in effect at the time of the events that are at issue in this case.

13

Request Form, and must send the form to the appropriate staff member or supervisor. *Id.* If an inmate does not receive a response to the written request within fifteen business days, or the inmate is not satisfied with the response to his request, they may file a Level 1 grievance. *Id.* 9.6(6)(A)–(C).

The Level 1 grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the grievance and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not attached. *Id.* 9.6(6)(C). The Unit Administrator shall respond in writing to the Level 1 grievance within thirty business days of his or her receipt of the grievance. *Id.* 9.6(6)(I). The Unit Administrator may extend the response time by up to fifteen business days upon notice to the inmate on the prescribed form. *Id.* 9.6(6)(J).

The inmate may appeal the disposition of the Level 1 grievance by the Unit Administrator to Level 2 review. *Id.* 9.6(6)(G), (I), (K). The Level 2 appeal of a Level 1 disposition must be filed within five calendar days from the inmate's receipt of the decision on the Level 1 grievance. *Id.* 9.6(6)(K). A Level 2 appeal based on the Unit Administrator's failure to dispose of the Level 1 grievance in a timely manner must be filed within sixty-five days from the date the Level 1 grievance was filed by the inmate. *Id.* 9.6(6)(M).

Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure, or Level 2 appeals that have not been replied to in a timely manner. *Id.* 9.6(6)(L).

Regarding Mr. Jordan's Fourteenth Amendment procedural due process claim, Administrative Directive 9.6(7) states that classification decisions for Administrative Segregation placement may be appealed by placing administrative remedy form CN 9602 in the

14

designated box within fifteen calendar days from the classification decision. No further appeal is available. *Id*. 9.6(7) ("The decision of the Unit Administrator or the Director of [Offender Classification and Population Management] shall not be subject to further appeal.").

Mr. Jordan also challenges the medical and mental health care available to him at Northern. Medical issues are exhausted by seeking a Health Services Review ("HSR") as provided in Administrative Directive 8.9.[7] There are two types of Health Services Review. The first seeks review of a diagnosis or treatment, including a decision to provide no treatment. Admin. Directive 8.9(9)(A). The second seeks review of an administrative issue, such as a particular practice, procedure, administrative provision, or policy, or it may allege improper conduct by a health services provider. *Id*. 8.9(9)(B). Mr. Jordan's claim that there were insufficient medical and mental health staff to properly treat the Administrative Segregation inmates is an administrative issue falling under the second type of HSR.

Before seeking an HSR, the inmate must attempt to seek an informal resolution of his claim by either discussing the claim, face to face, with the appropriate staff member or by submitting a written request using CN 9601, Inmate Request Form. *Id*. 8.9(10). Staff shall respond to the inmate within fifteen calendar days of the receipt of a written request. *Id*.

An inmate not satisfied with the informal resolution may file a request for a HSR. *Id*. 8.9(11). Requests for the first type of HSR, concerning diagnosis or treatment, require the inmate to check the "Diagnosis/Treatment" box on the HSR form. *Id*. 8.9(11). Upon receipt of the form, the HSR Coordinator evaluates, investigates, and decides each review. *Id*. 8.9(11)(A). The HSR

---

[7] The current Administrative Directive 8.9 became effective on April 30, 2021. Admin. Directive Chapter 8 Classification, Conn. State Dep't of Corr., https://portal.ct.gov/DOC/AD/AD-Chapter-8. This Order cites to the version of the Administrative Directive, as provided in Attachment 14 to Defendants' motion for summary judgment, *see* Attach. 14 to Defs.' Mot. for Summ. J., ECF No. 52-15 (Mar. 24, 2021), that was in effect at the time of the events that are at issue in this case.

Coordinator is to "schedule a Health Services Review Appointment . . . with a physician, dentist, or psychologist / psychiatrist . . . as soon as possible . . . to determine what action, if any, should be taken." *Id.* 8.9(11)(A). "If the physician decides that the existing diagnosis or treatment is appropriate, the inmate shall have exhausted the health services review." *Id.*

An inmate filing the second type of HSR must designate the "All Other Health Care Issues" box on the form and provide a concise statement of what he believes to be wrong and how he has been affected. *Id.* 8.9(12). The HSR Coordinator evaluates, investigates, and decides each review within thirty days. *Id.* 8.9(12)(A). Each review must be rejected, denied, compromised, upheld or withdrawn. *Id.* If the inmate is dissatisfied with the response, he may appeal the decision within ten business days. *Id.* 8.9(12)(B). HSR appeals are decided by the designated facility health services director or his designee within fifteen business days after receiving the appeal. *Id.* 8.9(12)(C).

### 1. The Conditions of Confinement Claim

Mr. Jordan contends that Defendants Cook, Bowles, Mudano, Baymon, Quiros, Maiga, Robles, Chevalier, and Mueller subjected him to unconstitutional conditions of confinement. He describes harsh conditions and contends that there were insufficient medical and mental health services to properly treat his various ailments.

In this action, Mr. Jordan characterizes his conditions claim as a challenge to the prolonged effects of solitary confinement during his time at Northern. *See* Compl. at 3. In his grievance, however, Mr. Jordan listed the conditions of confinement and argued that the conditions themselves were unconstitutional. *See* Ex. C at 55 ("I am grieving the horrific conditions being imposed on me in Northern . . . ."). He requested the same conditions as those for special needs inmates. *Id.* Prison officials denied the grievance as untimely because Mr.

Jordan had been aware of the conditions at Northern on May 31, 2019, but did not file his grievance until October 23, 2019. *Id.* As Mr. Jordan was filing a grievance to conditions that were present over thirty calendar days from the date of discovery of the cause of the grievance, the grievance was properly denied as untimely. Admin. Directive 9.6(6)(C).

Mr. Jordan filed a second grievance on April 7, 2020. *See* Ex. C at 80–81. In that grievance, he refers to "the pain and suffering of the torture that has been inflicted on me by D.O.C. by forcing me to live under these conditions," and then lists the conditions from his earlier grievance. *Id.* at 81. Although not clearly stated, this additional language could be construed to refer to the consequences of prolonged exposure to the conditions. Mr. Jordan filed this grievance only a week before he filed the Complaint. Prison officials rejected the grievance on May 19, 2020, and denied the appeal on June 18, 2020. *Id.* at 79, 81. Even if this second grievance had been sufficient to provide Defendants notice of his claim, Mr. Jordan did not complete the process until after this case was filed. Thus, the second grievance does not satisfy the exhaustion requirement. *See Neal*, 267 F.3d at 122-23 (agreeing with the view of other circuits which "held that exhausting administrative remedies after a complaint is filed will not save a case from dismissal").

Mr. Jordan alleges that he spoke to Warden Mudano about the cell conditions in June 2019. Compl. at 19. But he does not allege taking any further action regarding the cell conditions. Inmates "cannot satisfy the PLRA's exhaustion requirement solely by . . . making informal complaints" to prison staff. *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007); *see also Timmons v. Schriro*, No. 14-CV-6606 RJS, 14-CV-6857 RJS, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA.").

Thus, Mr. Jordan did not properly exhaust his administrative remedies on his conditions claim by mentioning the conditions to Warden Mudano.

Accordingly, summary judgment will be granted on these claims.

### 2.   The Mental Health Services Claims

Mr. Jordan also contends in general that the medical and mental health services provided for inmates at Northern were inadequate to address inmate needs, and that he was provided inadequate care for the injuries he allegedly sustained on May 30, 2019.

In his April 7, 2020 grievance, Mr. Jordan alleges that the services were inadequate. As explained above, this grievance is insufficient to exhaust the administrative remedies. In addition, as the claim concerns the provision of medical and mental health services, the claims should have been asserted by filing an HSR regarding "All Other Health Care Issues." Mr. Jordan filed copies of health care requests and grievances. The June 13, 2019 and July 16, 2019 HSRs concern treatment for the injuries allegedly sustained on May 30, 2019. *See* Ex. B to Pl.'s Mot. in Opp'n of Defs.' Summ. J. Mot. at 31, 34, 36, 43, ECF No. 53-2 (Apr. 12, 2021) ("Ex. B"). The July 27, 2019 and March 23, 2020 HSRs allege that DOC staff added mistaken information to his medical records. *Id.* at 44, 52–54. On the July 27, 2019 HSR, Mr. Jordan checked both boxes, for "All Other Health Care Issues" and "Diagnosis/Treatment." *Id.* at 44. On the March 23, 2020 HSR, he checked the "Diagnosis/Treatment" box. *Id.* at 53. The only other grievance was filed on April 3, 2020 and was marked as a "Diagnosis/Treatment" HSR. *Id.* at 57. Only in the April 3, 2020 HSR does Mr. Jordan cite staff deficiencies. This HSR cannot serve to exhaust Mr. Jordan's administrative remedies regarding claims of inadequate staffing because the grievance was not returned until May 8, 2020.

Thus, Mr. Jordan has exhausted his administrative remedies regarding medical claims only as to the claim for treatment of his May 30, 2019 injuries.

Accordingly, Defendants' motion for summary judgment will be granted as to the general challenge to adequacy of medical and mental health services and denied as to the claim regarding treatment for his May 30, 2019 injuries.

### 3.   The Procedural Due Process Claim

Mr. Jordan also contends that Defendants Mudano, Bowles, Baymon, Maiga, Robles, and Chevalier denied him procedural due process by failing to conduct periodic reviews of his Administrative Segregation placement, as required under prison directives. Compl. at 3, 7 (alleging that "[t]he limited reviews that Defendants did undertake were rote and mechanical," he was not provided notice of the reviews, and he was not permitted to attend the reviews). Mr. Jordan has filed another case, Jordan v. Gifford, No. 3:19-CV-1628 (CSH), in which he challenges the procedures used to place him on Administrative Segregation status. Initial Review Order at 8, Jordan v. Gifford, No. 3:19-CV-1628 (CSH) (D. Conn. Apr. 13, 2020), ECF No. 11.

Claims relating to Administrative Segregation placement are subject to the administrative remedy procedures set forth in Administrative Directive 9.6. Mr. Jordan submits no grievance challenging the periodic reviews as lacking or inadequate. The only grievance tangentially related to his classification is the appeal of the disciplinary report for refusing housing issued in connection with the decision to advance Mr. Jones to Phase 2 and transfer him to Garner Correctional Institution. Ex. C at 56–63. Although he disagreed with the issuance of the disciplinary report and claimed his actions were based on concerns for his safety, Mr. Jordan does not challenge the lack of notice of a review or lack of ability to be present. An appeal of a disciplinary finding is insufficient to put the defendants on notice that he was challenging the

periodic review process. *See Sulton v. Wright*, 265 F. Supp. 2d 292, 298 (S.D.N.Y. 2003) ("So long as the prisoner's grievance presents the relevant factual circumstances giving rise to a potential claim . . . sufficient under the circumstances to put the prison on notice of potential claims and to fulfill the basic purposes of the exhaustion requirement . . . . [T]here does not appear to be any reason to require a prisoner to present fully developed legal and factual claims at the administrative level." (internal citation and quotation marks omitted)). Thus, Mr. Jordan also failed to exhaust his administrative remedies on this claim.

Accordingly, Defendants' motion for summary judgment will be granted on the Fourteenth Amendment procedural due process claim.

### B. Supervisory Liability

Mr. Jordan has exhausted his administrative remedies regarding his medical treatment for the injuries suffered on May 30, 2019. He fails, however, to allege facts showing the personal involvement of any of the remaining Defendants in his medical care for those injuries.

To prevail on his medical claims, Mr. Jordan must present facts establishing Defendants' personal involvement in the alleged constitutional violation. *Costello v. City of Burlington*, 632 F.3d 41, 48–49 (2d Cir. 2011) ("[The plaintiff's] claims against the remaining Defendants fail [because] . . . . [t]he complaint does not allege facts establishing the personal involvement of any of the individual Defendants . . . . This defect is fatal to [the plaintiff's] claim under 42 U.S.C. § 1983." (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994))). Thus, he must demonstrate that the defendants were deliberately indifferent to his medical needs, *i.e.*, that he has a serious medical need and that Defendants were actually aware that he would suffer serious harm as a result of their actions or inactions. *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) ("[T]he charged officials must be subjectively reckless in their denial of

medical care. This means 'that the charged official [must] act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result.'" (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006))).

All of the Defendants are described as high-ranking officials. Supervisory officials cannot be held liable merely because they hold supervisory positions. The Second Circuit has recently clarified the standard to be applied to a claim of supervisory liability. *See Tangreti v. Bachman*, 983 F.3d 609, 612 (2d Cir. 2020) ("Following *Ashcroft v. Iqbal*, . . . courts may not apply a special rule for supervisory liability. Rather, the plaintiff must directly plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (internal citation and quotation marks omitted)). Before the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit had identified five categories of conduct that would establish liability of supervisors for the conduct of a subordinate in a § 1983 action, two of which were creation of a policy under which unconstitutional acts occurred and failure to act on information that unconstitutional acts were occurring. *See Tangreti*, 983 F.3d at 616 ("Before the Supreme Court decided *Iqbal*, we identified five categories of evidence that may establish the liability of a supervisory official for a subordinate's conduct under § 1983[.]").

In *Iqbal,* the Supreme Court rejected a theory of supervisory liability that permitted a supervisor to be "held liable based on a lesser showing of culpability than the constitutional violation requires." *Id*. at 617 (quoting *Iqbal,* 556 U.S. at 677) (internal quotation marks omitted). In *Tangreti*, the Second Circuit adopted this view and held that, "after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the

Constitution.'" *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676). Thus, Mr. Jordan must present evidence showing that each defendant was personally aware of and disregarded his medical needs as a result of the May 30, 2019 incident.

Mr. Jordan has submitted no evidence showing that any defendant was personally aware of his medical issues. He appears to assume that they knew because he filed grievances. But even if they were aware, "[a] supervisor's 'mere knowledge . . .' is not sufficient because that knowledge does not 'amount[] to the supervisor's violating the Constitution.'" *Tangreti*, 983 F.3d at 616-17 (quoting *Iqbal*, 556 U.S. at 677)); *see also Lopez v. Chappius*, 6:17-CV-06305 EAW, 2021 WL 859384, at *2 (W.D.N.Y. Mar. 8, 2021) ("Even before *Tangreti*, it was well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find that the defendant was personally involved in the deprivation alleged . . . ." (internal citation and quotation marks omitted))

Accordingly, as Mr. Jordan fails to present evidence showing that any defendant was personally involved in, or even aware of, his medical issues following the May 30, 2019 incident, Defendants' motion for summary judgment will be granted on this claim.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**.

If Mr. Jordan has now exhausted his administrative remedies on his claim regarding the prolonged effects of solitary confinement, he may file a new action.

The Clerk of Court is directed to enter judgment in favor of the Defendants and close this case.

**SO ORDERED** at Bridgeport, Connecticut this 11th day of March, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE