# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VICTOR JORDAN,

            Plaintiff,

    v.

CORRECTION OFFICER GIFFORD et al.,

            Defendants.

Civil Action No. 3:19-cv-1628 (CSH)

**AUGUST 4, 2022**

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge**

On October 15, 2019, Plaintiff Victor L. Jordan, Sr., a sentenced inmate incarcerated within the custody of the Connecticut Department of Correction ("DOC"), filed this civil rights complaint pro se pursuant to 42 U.S.C. § 1983 against a number of DOC officers and nurses (collectively, "Defendants") at MacDougall-Walker Correctional Institution ("MacDougall") and Northern Correctional Institution ("Northern"). Specifically, he has sued MacDougall Correction Officers ("COs") Gifford, Russell, LaMountain, Rivenburgh, Benjamin Peterson, Brown, and Nicholas Briatico; Lieutenants Lucas Mihaliak and Ryan Legassey; Registered Nurses ("RNs") Henry Mushi and Debbie Lembrick; Northern RN Mara Scott[1] and Nurse Supervisor Vicki Kilham[2]; Northern Warden Giuliana Mudano; DOC Administrative Segregation Hearing Officer Counselor

---

[1] Plaintiff's Complaint referred to this defendant as RN Scott Maro, but Defendants' materials in support of their motion for summary judgment show that the correct name of this defendant is Mara Scott. *See* Defs.' Local Rule 56(a) Statement ("Defs.' Rule 56(a)"), Doc. 55-2, ¶ 56).

[2] Plaintiff's complaint refers to this defendant as Nurse Supervisor Kehlam, but the record shows that her last name is actually spelled Kilham. *See* Defs.' Rule 56(a) ¶ 64.

Supervisor E. Tugie; DOC Director of Offender Classification and Population Management David Maiga; and DOC then-Deputy Commissioner of Operations Angel Quiros. Compl., Doc. 1, at 1–3.

Following review of his claims pursuant to 28 U.S.C. § 1915A, the Court permitted the case to proceed on the following:

- Eighth Amendment claims of excessive force against COs Gifford, Russell, LaMountain, Rivenburgh, Peterson, Brown, and Briatico and Lieutenants Mihaliak and Legassey;

- Eighth Amendment claims of deliberate indifference to medical needs against COs Gifford, Russell, LaMountain, Rivenburgh, Peterson, and Brown; RNs Mushi, Lembrick, and Scott; Nurse Supervisor Kilham; and Warden Mudano;

- Fourteenth Amendment due process claims concerning Plaintiff's Administrative Segregation placement against Warden Mudano, Deputy Commissioner Quiros, Director Maiga, and Counselor Supervisor Tugie; and

- state law claims of assault and battery against COs Gifford, Russell, LaMountain, Rivenburgh, Peterson, Brown, and Briatico and Lieutenants Mihaliak and Legassey.

Initial Review Order, Doc. 11, at 22.

Defendants now move for summary judgment on all claims in this action. *See generally* Mot. for Summ. J., Doc. 55. They support that motion with a memorandum (Mem. in Supp., Doc. 55-1 ("Defs.' Mem.")), a statement of material facts under Local Rule of Civil Procedure 56(a)1 (Defs.' Rule 56(a), Doc. 55-2), and documentary and video evidence (Docs. 54, 55-3 to 55-14, 58, and 62).

Plaintiff opposes the motion for summary judgment. *See generally* Mem. in Opposition re Mot. for Summ. J., Doc. 60 ("Pl.'s Mem."). In support of his opposition, Plaintiff has included a Local Rule 56(a)2 statement (Pl.'s Rule 56(a), Doc. 60, at 3–8) and exhibits (Docs. 60-1 to 60-3).

This Ruling resolves the pending motion for summary judgment.

## I. FACTUAL BACKGROUND

The following factual background is derived from the Complaint[3] and the parties' statements of facts filed pursuant to Local Rules 56(a)1 and 2.[4] *See* Defs.' Rule 56(a); Pl.'s Rule 56(a). Defendants' Rule 56(a) relies upon video surveillance evidence (which is under seal) of events on the relevant date of November 26, 2015. *See* Docs. 58 and 62.

Jordan was a sentenced inmate housed at MacDougall-Walker Correctional Institution on May 30, 2019. Defs.' Rule 56(a) ¶ 5. Jordan transferred to Northern Correctional Institution on May 31, 2019. *Id.* ¶ 6. Thereafter, he was transferred to Cheshire Correctional Institution on October 14, 2020. *Id.* ¶ 7.

---

[3] The Court's review of the factual background in this matter also reflects consideration of the Verified Amended Complaint. *See* Compl.; *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e).").

[4] The Defendants informed Plaintiff of the requirements for filing his papers in opposition to the motion for summary judgment under Local Rule 56. *See* Doc. 55-15. Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local Rule 56(a)2 Statement[] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Thus, the Court may consider any unopposed facts to be admitted if supported by evidence. Where a plaintiff or defendant admits to (or fails to oppose) a particular fact, the court cites only to the relevant paragraph in the Verified Amended Complaint or the Local Rule 56(a)1 Statement.

On May 30, 2019, Defendant COs Gifford and Russell conducted a random shakedown on the cell that housed Plaintiff and his cellmate, Pipkin. *Id.* ¶ 8. During the search, homemade alcohol was found in violation of DOC's institutional rules. *Id.* ¶ 9. Defendants Gifford and Russell exited the cell and the contraband in a bag was placed on the floor outside the cell door. *Id.* ¶ 10. Defendant Russell called Plaintiff to the cell to be questioned about the contraband. *Id.* ¶ 11. Plaintiff then went into his cell. *Id.* ¶ 12.

Defendant COs LaMountain and Rivenburgh arrived in the unit and proceeded to Plaintiff's cell. *Id.* ¶ 15.

Plaintiff subsequently removed his clothing and took hold of the wooden cane that he used for support due to his Achilles tendon injury. *Id.* ¶ 18. CO Gifford called for back-up assistance due to assault on staff. *Id.* ¶ 20. Correctional staff responded and ran towards Plaintiff's cell. *Id.* ¶ 21. LaMountain entered the cell and claims that Plaintiff struck him with the cane (which Plaintiff disputes). *Id.* ¶ 22; Pl.'s Rule 56(a) ¶ 22 (disputing claim that Plaintiff struck LaMountain). LaMountain struck Plaintiff with a closed fist; LaMountain asserts he did so to stop Plaintiff's assault on him with the cane. Defs.' Rule 56(a) ¶ 23.

COs Gifford, Russell, and Peterson entered the cell and began to strike Plaintiff for the purpose (which they assert and Plaintiff disputes) to stop the assault. *Id.* ¶ 24; Pl.'s Rule 56(a) ¶ 24 (claiming that Plaintiff was not attacking LaMountain but only grabbed hold of LaMountain's arms when Plaintiff slipped and both fell down). CO Brown later entered the cell. Defs.' Rule 56(a) ¶ 25. CO Brown delivered knee strikes to Plaintiff's tibial nerve. *Id.* ¶¶ 26, 27; *but see* Pl.'s Rule 56(a) ¶¶ 26, 27 (Plaintiff was restrained by correctional staff at the time).

Lieutenant Mihaliak entered the cell and deployed a burst of chemical agent to Plaintiff's facial area. Defs.' Rule 56(a) ¶ 28. Later, Lieutenant Legassey deployed a burst of chemical agent

4

on Plaintiff. *Id.* ¶ 29. The parties dispute the extent to which Plaintiff was secured and restrained at the time. *See id.* ¶¶ 24–29; Pl.'s Rule 56(a) ¶¶ 24–29.

Officer Bassett arrived in the unit to record the escort of Plaintiff to the Restrictive Housing Unit ("RHU"). *Id.* ¶ 32. CO Peterson secured Plaintiff's left side and CO Rivenburgh secured his right side to reverse escort Plaintiff out of the unit. *Id.* ¶ 33. Plaintiff began to cough as a result of the effect of the chemical agent, and he informed staff that his wrist was hurt. *Id.* ¶¶ 34–35. A universal precaution veil was applied to Plaintiff's face to protect staff from being exposed to bodily fluids during the escort. *Id.* ¶ 36. Plaintiff expressed that he had not known that his medical pass for the cane had expired. *Id.* ¶ 37.

Defendants entered a shower area, turned on the water, and placed Plaintiff's head under the water. *Id.* ¶ 38. CO Briatica conducted a controlled strip of Plaintiff, who was then placed in socks, boxers, a t-shirt, a jumpsuit, and in-cell restraints without incident. *Id.* ¶ 39.

RN Mushi entered Plaintiff's cell and conducted an in-cell restraint assessment check that Plaintiff claims was inadequate. *Id.* ¶ 40; Pl.'s Rule 56(a) ¶ 40. Paperwork completed by Mushi states that Plaintiff refused to answer the health evaluation questions for the RHU placement and that Plaintiff had "no injury or trauma noted, skin intact" and "both wrists and ankles checked bilateral." Defs.' Rule 56(a) ¶ 41. Plaintiff claims that the medical report was fabricated. Pl.'s Rule 56(a) ¶ 41.

Lieutenant Mihaliak made the determination to place Plaintiff on in-cell restraints for staff safety. *Id.* ¶ 42. Mihaliak conducted a final assessment of the in-cell restraints for proper spacing, although Plaintiff claims that the restraints were extremely tight. *Id.* ¶ 43; Pl.'s Rule 56(a) ¶ 43. Correctional staff then exited the cell and Bassett was instructed to sign off the camera. Defs.' Rule 56(a) ¶ 44.

While on in-cell restraint status, Plaintiff was observed every fifteen minutes and the observational information was recorded. *Id.* ¶ 45. The observational record stated that Plaintiff was yelling, cursing, and pacing in his cell during observation. *Id.* ¶ 46.

Because staff was allegedly assaulted, Connecticut State Police were summoned to the facility and are reported to have arrived shortly before 10:00 PM on May 30, 2019. *Id.* ¶ 47. Troopers Mendoza and Karadimos met with the four injured correctional officers, who gave verbal and written statements regarding the events that took place earlier that night. *Id.* ¶ 48. Trooper Karadimos recorded that he met with Plaintiff, who indicated that he had been assaulted by the correctional staff. *Id.* ¶ 49; Pl.'s Rule 56(a) ¶ 49.

Plaintiff was downgraded from in-cell restraints in advance of his transfer to Northern Correctional Institution. Defs.' Rule 56(a) ¶ 51. After Plaintiff complained about his right ankle, staff called for a wheelchair for his transport. *Id.* ¶ 53. After calling for the wheelchair, RN Lembrick assessed Plaintiff's restraints, circulation, and right arm. *Id.* ¶ 54; Defs.' Ex. 3 (Video 19-953 ("Video Three") 9:24–10:33) (Docs. 58 and 62).

On a medical report, RN Lembrick noted the following: "[I]nmate is alert and Ox3, skin is intact, small abrasion on right wrist would not move the fingers of his right hand during assessment but inmate had good CMS bilateral wrists and ankle, and good flexion of ankles and left hand. No contusions. There is a small scab on right ankle but no bruises." Defs.' Rule 56(a) ¶ 55. Plaintiff claims this report is inaccurate because he could not flex his ankles and required a wheelchair. Pl.'s Rule 56(a) ¶ 55.

A medical note signed by RN Scott upon Plaintiff's transfer to Northern reports: "New intake to NCI. Inmate denies any immediate medical problem. Inmate alert and oriented x 3. Inmate vital sign stable. Nurse discussed with inmate the event that led to his tran[s]fer to NCI and

oriented him to the infirmary. Inmate denies any injuries." Defs.' Ex. 5, Doc. 54 ("Med. R. Pt. 1"), at 89.[5]

On May 31, 2019, Plaintiff was placed in the infirmary pending his Administrative Segregation determination. Defs.' Rule 56(a) ¶ 57. At 12:56 PM, Scott Mueller, Psy.D., interviewed Plaintiff. *Id.* ¶ 59. Dr. Mueller observed that Plaintiff "reported mood fluctuations and quick temper" but was "euthymic, calm[,]" and a preliminary treatment plan would address Plaintiff's quick temper and mood swings with a goal to improve impulse control and anger management. *Id.* Plaintiff claims that Dr. Mueller was biased and made him feel uncomfortable. Pl.'s Rule 56(a) ¶ 59.

At 1:03 PM, Plaintiff was seen by Nurse Brett Rosenberg, who recorded the following note: "c/o left ankle pain. Walks w/ slight limp. c/o right rib pain. xray ordered. Small superficial laceration right wrist. bacitracin applied . . . ." Defs.' Rule 56(a) ¶ 61. At 1:34 PM, the x-rays taken of Plaintiff's ribs revealed no fracture. *Id.* ¶ 62.

Also on May 31, MacDougall Warden Barone recommended to Director Maiga that Plaintiff be considered for Administrative Segregation. *Id.* ¶ 63.

On June 1, 2019 at 11:26 AM, Northern Nurse Supervisor Kilham noted that Plaintiff refused a state-issued meal but "offers no complaints." *Id.* ¶ 64. Defendants maintain that Plaintiff commenced a hunger strike between June 2 and June 5, 2019, while Plaintiff claims that his hunger strike commenced on May 31, 2019. *Id.* ¶ 65; Pl.'s Rule 56(a) ¶ 65.

---

[5] Plaintiff claims that he was not evaluated or assessed by RN Scott and notes that the medical record shows "Cybulski Portion" as the facility where the care occurred. Pl.'s Rule 56(a) ¶ 50. It is not clear from the present record that Plaintiff was ever at the Cybulski facility, and Defendants do not explain why RN Scott's medical note indicated that Plaintiff's intake assessment occurred at Cybulski. However, the note clearly addresses Plaintiff's intake process for his Northern transfer.

On June 4, 2019, Dr. Michael Clements met with Plaintiff and discussed the results of the rib x-ray, prescribed Tylenol for any continued rib pain, and informed Plaintiff that he would order wrist x-rays. Defs.' Rule 56(a) ¶ 66.

On June 6, 2019, Plaintiff submitted an informal request form to the medical unit concerning his need for treatment of his ribs, wrists, left foot, and genitals. *Id.* ¶ 67.

On June 7, 2019, Plaintiff was informed that a hearing would be held on June 12, 2019 to determine whether he should be placed on Administrative Segregation as a result of his alleged assault on staff. *Id.* ¶ 69.

On June 9, 2019, Plaintiff was assessed by mental health staff concerning his allegation of having been sexually assaulted on May 30, 2019. *Id.* ¶ 70. The medical record indicates that Plaintiff refused to have a physical assessment responsive to his complaints of pain to his ribs, wrist, hand, and foot, and his asserted need for lotion for his genitals due to chemical burn. *Id.* The medical note indicates that he refused to be examined in his "private area." Med. R. Pt. 1 at 37. Plaintiff asserts that he did not refuse to be evaluated for his complaints of wrist, foot, and neck pain, and in support, cites medical records showing that he was assessed for neuropathy in December 2019 and January 2020. Pl.'s Rule 56(a) ¶ 70.

On June 9, 2019, a Connecticut State Police Trooper obtained a written statement from Plaintiff regarding his allegations of sexual assault by staff on May 30, 2019. Defs.' Rule 56(a) ¶¶ 71, 72.[6]

On June 10, 2019, Plaintiff submitted the following statement to CTO Session in advance of his Administrative Segregation hearing:

---

[6] On June 11, 2019, the Connecticut State Police Report dated June 6, 2019 was closed based on a finding that no criminal action (the alleged sexual assault) occurred during the incident with Plaintiff. *Id.* ¶ 74.

On 5-30-19 approx 8:10 p.m. . . . C/O Gifford and partner C/O approached me and ask me to step out for routine shake down. I complied and several minutes later C/O stepped out of cell with material of contraband "pruno". I step back into my cell against objection of C/O. I told him that I intended to pack my belonging because I knew I was going to Seg (RHU) and to call supervising officer and that he could not step back into cell without Capt/Lt and camera "video". I had my wooden cane in hand for support for my right Achilles injury. C/O called on radio for assistance. Other C/O arrived at door and I repeated myself and then I took off all my clothing to show that I was no threat and that I knew is was gonna be stripped search also that he couldn't violate protocol and come in that cell with me under the circum- stances. He did not abide by that and came in yelling at me, punching me in my face several times. I dropped the cane and defended myself by grabbing his arms, he slipped and fell back on the clothing on floor and I was still holding his arms. Other C/O came in cell jumped on my back put me in choke hold and pulled me backwards. Then C/O Peterson comes in to cell punching several times in the face left side and several times in my ribs then twisting my left arm in restraint then I was turned on my stomach left arm behind me right arm pulled across top of head in opposite direction. Chemical spray was sprayed in face, then some one sexually assaulted my anus. I was being hit "beaten" and twisted as well, then my genitals was sprayed. This happened while I was semi-conscious. I was raised up, shorts were put on me and then I was slammed against walls until I was placed in RHU.

*Id.* ¶ 73.

On June 13, 2019, Plaintiff submitted an inmate request form to the medical unit about his continued pain in the wrist and ribs and his demand for an MRI and pain medication. *Id.* ¶ 75. That same day, he filed a Health Services Review under Administrative Directive 8.9, complaining that the medical staff failed to diagnose and treat the rib damage, left "foot ankle" injury, wrist gash and bruises from cuffs, nerve damage, and "assault" to his genital area sustained on May 30, 2019; that he had been forced to go on a hunger strike to get bare-minimum medical treatment; and that he still had yet to receive proper treatment including an MRI. *Id.* ¶ 76; Defs.' Ex. 11, Doc. 55-13, at 16. Plaintiff also submitted an inmate request to the "Warden of MacDougall/Administration, Wethersfield" complaining that he had been assaulted by MacDougall correction officers on May 30, 2019; that CO Peterson punched him in the face and ribs several times; that he was sprayed with a chemical agent; that he was sexually assaulted in the anus and sprayed with the chemical

agent in the genital area and anus; and that he was slammed during his trip to the RHU. Defs.'
Rule 56(a) ¶ 77; Defs.' Ex. 7, Doc. 55-9, at 13.

On June 14, 2019, Plaintiff attended a hearing for placement on Administrative Segrega-
tion. Defs.' Rule 56(a) ¶ 78. At the hearing, he stated: "I am not doing a program. I asked to be
here. I just want to be left alone. The statement to my advisor speaks for itself. I have nothing
else." *Id.* Hearing Officer Tugie received into evidence Plaintiff's statement, Warden Barone's
memorandum to Defendant Maiga, and photographs of the May 30 incident scene. *Id.* ¶ 79.

On June 15, 2019, Plaintiff submitted an inmate request form stating, "My throat has been
sore for a couple of weeks. It hurts when I swallow and is tender to the touch as well. I was put
into choke hold by C/O a couple of weeks ago." *Id.* ¶ 80.

On June 19, 2019, Plaintiff was placed on Administrative Segregation status at Northern
Correctional Institution. *Id.* ¶ 81. The Hearing Summary provided the following rationale for Plain-
tiff's Administrative Segregation placement:

> On May 30, 2019 in '0' Unit at the Macdougall Correctional Institution, staff was
> conducting a random shakedown of inmate Jordan's #165080 cell (0 Unit- 29 cell).
> During the shakedown, staff discovered a contraband item and addressed inmate
> Jordan and his cellmate about it. Inmate Jordan entered the cell, became agitated,
> and yelled for Lieutenants to respond. A code was called requesting additional staff
> assistance. Inmate Jordan proceeded to remove all of his clothes and advance at
> staff. Inmate Jordan utilized his cane as a weapon in his right hand and was striking
> staff with his left hand. It took several staff members to restrain inmate Jordan and
> gain compliance. As a result of his actions, several staff members were sent to an
> outside medical facility for treatment of injuries. Victor Jordan #165080 is currently
> serving an 81 year sentence for Sexual Assault 1st- aggravated, Conspiracy/At-
> tempt to Commit Robbery 3rd, and Sale of Hallucigen/Narcotic Substance. Since
> his first incarceration in 1988, he has amassed 51 disciplinary reports including, but
> not limited to: five for Threats, eight for Assault, eight for Disobeying a Direct
> Order, and seven for Fighting. In order to ensure the safety and security of staff,
> inmates and the public, Warden Barone has requested that inmate Jordan be re-
> viewed for a higher level of security.

Defs.' Ex. 9, Doc. 55-11, at 4.

On June 20, 2019, Plaintiff submitted an inmate request form to the medical unit claiming that his throat was feeling worse, and that he found it harder to swallow. Defs.' Rule 56(a) ¶ 82.

On June 21, 2019, x-rays were taken of Plaintiff's wrists. *Id.* ¶ 83. The x-ray of the left wrist revealed suspected osteoarthritis. *Id.* The x-ray of the right wrist revealed no acute fracture or dislocation, an old-healed fracture deformity, and congenital coalition of the lunate and triquetral bones of the carpus, or wrist. *Id.*

On June 22, 2019, Plaintiff was seen by Licensed Practical Nurse ("LPN") Riggins for a sore throat and was instructed to gargle with salt. *Id.* ¶ 84.

On June 28, 2019, Plaintiff submitted a Level 1 Grievance under Administrative Directive 9.6, complaining that correctional officers applied excessive force on May 30, 2019. *Id.* ¶ 86.

On June 30, 2019, Plaintiff submitted an informal request form concerning his sore throat pain, wrist and hand pain believed to be nerve damage, and rib and abdomen pain. *Id.* ¶ 87.

On July 2, 2019, Dr. Michael Clements met with Plaintiff and ordered that x-rays be taken of his ribs, left foot, and neck. *Id.* ¶ 88. Dr. Clements also prescribed Ibuprofen 600 mg. *Id.* He noted that Plaintiff complained of ongoing rib, throat, and left foot pain "since altercation of May, 2019." Med. R. Pt. 1, at 18.

That same day, Plaintiff's medical grievance dated June 13, 2019 was disposed of as "change in treatment" as he had been seen by Dr. Clements and a treatment plan had been put into place. Defs.' Rule 56(a) ¶ 89.

On July 6, 2019, Plaintiff met with Matthew Clark, a Licensed Practical Counselor ("LPC"), who noted that Plaintiff expressed that he had "a lot of issues with what happened at my previous facility. I am usually not on the receiving end of violence. These are new feelings for me." *Id.* ¶ 90.

On July 7, 2019, Plaintiff asserted his need to be seen by dental staff. *Id.* ¶ 91. Plaintiff was seen by dental staff three days later, on July 10, 2019. *Id.*

Also on July 10, Plaintiff attended a disciplinary hearing on the charges issued for the May 30, 2019 assault on staff. *Id.* ¶ 92. The Disciplinary Hearing Officer received as evidence the disciplinary report dated May 30, 2019 and delivered at approximately 10:20 PM by CO Brown; the disciplinary investigation report in which Plaintiff claimed that the disciplinary report was not delivered to him and requested video preservation to show the same; a synopsis of the stationary camera at MacDougall; witness statements from three inmates all of whom reported that they did not know who Plaintiff was; and a portion of the incident report. *Id.* ¶ 93.

> Plaintiff pleaded not guilty but was determined by the Hearing Officer to be guilty:
>
> I/M advised of the hearing process. I/M declined advisory services but wished to have an advisor present at the hearing. This request was granted and CTO Sessions sat in on the hearing. I/m pleads "not guilty." Witness statements read and assessed. I/M claims he was assaulted and did not assault any staff members. I/M goes on to state that he stripped naked and told the officers to call for the Lt's and a camera. I/M concludes by stating he will be taking this to court. Based on the fact that I/M admits to stripping naked and calling for a Lt. and camera which precludes to him getting ready for a confrontation, the fact that staff members were injured, and the fact that he refused to follow direction from a Lt. and was subsequently sprayed with chemical agent, the I/M is found guilty.

*Id.* ¶ 94.

On July 12, 2019, x-rays of Plaintiff's ribs (*i.e.*, his left hemithorax) and left foot remained unchanged; x-rays of his neck were, however, deemed to be incomplete as the technician could not evaluate the hyoid bone and thyroid cartilages, which are the areas associated with "usual trauma in choking." *Id.* ¶ 95; Med. R. Pt. 1 at 5.

On July 16, 2019, Plaintiff submitted a Health Services Review under Administrative Directive 8.9 complaining of improper treatment and his belief that the medical unit was in "cahoots with DOC admin. to cover up" his injuries suffered from the use of excessive force. Defs.' Rule

56(a) ¶ 96. He claimed to have not yet received "proper medical care[;]" claimed that he had not been receiving the pain medication prescribed by Dr. Clements; and requested "proper medical care" for his throat pain, "feet ankle[,]" left rib cage, and wrist and hands (including nerve damage). *Id.*; Defs.' Ex. 11, Doc. 55-13, at 14.

Plaintiff also submitted a form to the medical unit requesting the results of his most recent x-rays and a copy of his medical records from May 30, 2019 to present. Defs.' Rule 56(a) ¶ 98.

On July 17, 2019, Dr. Mueller met with Plaintiff cell-side (with limited assessment), noting that Plaintiff had "no acute MH issues reported or observed" and that Plaintiff required monitoring as a mental health patient. *Id.* ¶ 97. Plaintiff asserts that he informed Dr. Mueller that he suffered from psychological issues. Pl.'s Rule 56(a) ¶ 97.

On July 24, 2019, Plaintiff submitted two forms to the medical unit indicating that he wanted to see the x-rays of his ribs, foot, and wrist, and "if not[,] I want an MRI done[;]" that his right hand was still numb; that he believed he had nerve damage; that his foot hurt; and that his throat felt sore. Defs.' Rule 56(a) ¶ 99.

On July 26, 2019, Plaintiff received a response to his June 28, 2019 Level 1 Grievance under Directive 9.6, which was denied for the stated reason that

> there is no evidence to substantiate your claims of any staff misconduct and/or any violation of Administrative Directive 2.17, Employee Conduct. All staff acted in appropriate professional manner in accordance with policy and procedures. Furthermore, please keep in mind inmates don't dictate staff discipline.

*Id.* ¶ 100. Plaintiff disputes the findings in this denial. Pl.'s Rule 56(a) ¶ 100.

On July 27, 2019, Plaintiff submitted a Health Services Review under Administrative Directive 8.9 for "All Other Health Care Issues," stating:

> This is in regards to medical staff RN Maro Scott Medical Report from 5/31/19 at 3:05 p.m. I am claiming that the report is false and fabricated to cover up for the deliberate indifference. I received copys of this report from record approx. 7/24/19.

> Upon my intake into this facility I made it clear to everyone present that I required immediate medical attention concerning my injuries, which consisted of: my left foot ankle, both my hands and wrist, my ribs on left. I did not at any time deny immediate medical attention. I was force to go on a hunger strike for the purpose of getting medical care, proper care diagnosis, x-rays, etc. I made my concerns clear to medical staff here, as well as other facility. My request and complaints was disregarded. I believe it was with the intent to cover up for D.O.C. Excessive force by falsifying said document. This a violation of my civil rights and my well being. The nurse should be relieved of his or her job.

*Id.* ¶ 101; Defs.' Ex. 11, Doc. 55-13, at 10.

On July 29, 2019, Plaintiff submitted an inmate request form to the medical records unit to request a copy of his rib x-rays dated 6/31/19 and any records relating to his hunger strike, mental health reports, and treatment from 5/31/19, including diagnosis and treatment records. Defs.' Rule 56(a) ¶ 102.

On July 31, 2019, LPC Clark met with Plaintiff to discuss a treatment plan for depression. *Id.* ¶ 103.

On August 3, 2019, Plaintiff met with RN Flood-Browne regarding the results of his x-rays. *Id.* ¶ 104. The RN noted that Plaintiff "has seen the written results, but he is not satisfied with the findings." *Id.*

On August 6, 2019, Plaintiff filed a Level 2 Grievance Appeal Form under Administrative Directive 9.6, claiming, "The DOC is trying to cover up a clear violation of my civil rights. C/O LaMountain came into the cell to do bodily harm to my person which lead to other C/Os coming in to abuse me with excessive force & sexual assault." *Id.* ¶ 105.

On August 13, 2019, Plaintiff received a response to his inmate request form dated July 16, 2019 as "PPT entered" and "ortho & neuro appts. submitted. Medication, X-ray and follow-up wrists ordered." *Id.* ¶ 106.

That same day, Dr. Clements requested the Utilization Review Committee's approval for Plaintiff to undergo EMG/Nerve conduction for his "nerve/neurological disorder" due to "persistent numbness" in his right wrist that Plaintiff attribute to a "prior incident with handcuffs." *Id.* ¶ 107. Dr. Clements also requested approval for Plaintiff to have an orthopedic consultation for left foot small toe pain, right foot pain, and decreased strength, and a "return visit to re-address potential role of surgery." *Id.* ¶¶ 107–08. Dr. Michael Clements also ordered a further x-ray of Plaintiff's neck and prescribed Gabapentin. *Id.* ¶ 109.

On August 16 and 26, 2019, Plaintiff refused a soft tissue neck x-ray. *Id.* ¶ 110.

On August 19, 2019, Edward Gonzalez, a Licensed Clinical Social Worker ("LCSW"), met with Plaintiff and reported that Plaintiff indicated he had "been working on keeping [himself] from getting into any type of trouble." *Id.* ¶ 111. Gonzalez found Plaintiff to be calm and stable "in reference to his mental status" with normal "thought content, insight, judgment and psychomotor activity . . . ." Defs.' Ex. 5, Doc. 54-1 ("Med. R. Pt. 2"), at 71.

On August 28, 2019, Plaintiff's Level 2 Grievance Appeal was denied for the stated reason that "[t]he response from Warden Barone was appropriate. This incident was thoroughly reviewed and your claim of staff misconduct is without merit." Defs.' Rule 56(a) ¶ 112.

On September 7, 2019, Plaintiff's Health Services Review under Directive 8.9 dated July 27, 2019 was denied and Plaintiff was instructed to "please fill out HR303A form with complaint." *Id.* ¶ 113. That same day, Plaintiff filed an appeal of his Health Services Review under Administrative Directive 8.9, stating that "the medical department and its staff has been failing in their duty and have been in cahoots with DOC to cover up excessive force by either not doing proper examination and or documenting injuries sustained from excessive force by DOC and filing false reports[.]" *Id.* ¶ 114. He attached a completed Request for Amendment of Health Information (form

HR303A) seeking to have his medical records amended to reflect that on May 31, 2019 at 3:05 PM, RN Scott "never examined me. A legitimate report would reflect all of my injuries I received from 5/30/19 from excessive force." *Id.*; Defs.' Ex. 11, Doc. 55-13, at 8–9.

On September 13, 2019, LCSW Gonzalez met with Plaintiff. Defs.' Rule 56(a) ¶ 115. Plaintiff expressed "issues with sleeping in the evenings" and requested that Gonzalez "please inform the doctor" that he needed to speak with her about his anxiety, although he had been "try[ing his] best" to manage it by reading and working out. *Id.*

On September 25, 2019, Dr. Mueller met with Plaintiff cell-side and noted Plaintiff's mood as "anxious with appropriate affect" but "[a]lert and oriented x 3[,]" "TP logical and coherent[,]" and without "psychotic symptoms evident or reported[,]" although Plaintiff expressed "ongoing difficulty with sleeping and said he is experiencing increased anxiety, flashbacks, and mood swings." *Id.* ¶ 116. Dr. Mueller indicated further that Plaintiff had expressed that he "would like to meet with the prescriber to consider medications that may help." *Id.* Dr. Mueller noted that he had provided "[s]upportive counseling" but had "[n]o other concerns at this time." *Id.*

On September 26, 2019, Plaintiff submitted an inmate request form stating that he wanted to be placed on Special Needs status as a result of what happened to him on May 30, 2019, because he did not "think that some people are gonna be safe from [him]" and that he would be more comfortable and safe on this status secluded from the general population. *Id.* ¶ 117; Med. R. Pt. 2 at 61.

On October 1, 2019, Advanced Practitioner Registered Nurse ("APRN") Andrea Resicherl met with Plaintiff to conduct a Mental Health Psychiatric Evaluation. Defs.' Rule 56(a) ¶ 118. She reported that he "understands he grew up dealing with issues in a violent manner and also realizes that it is not a healthy coping skill[;]" that he "continues to act aggressively[;]" and that he

"reported he is a vindictive person and feels his behaviors should have purpose—and in his mind, if someone does something wrong they should be punished, including the officers at MacDougall." *Id.* She observed that there is "no clinical indication for medication intervention at this time." *Id.* ¶ 119.

On October 2, 2019, Plaintiff submitted an inmate request form complaining that his pain medication was not effective as he had "pain in [his] ankles, knee and back now." *Id.* at ¶ 119.

On October 3, 2019, Plaintiff was seen in the medical unit for his complaints about ankle, knee, and back pain and ineffective medication. *Id.* ¶ 120.

On October 7, 2019, Plaintiff submitted an inmate request form to Dr. Mueller requesting placement on special needs, stating:

> I have made it clear on several occasion that I do not intend to be housed in general pop. Again & or cell partnered. If any attempts are made from this point on, I m gonna start hurting people. I have nothing to lose at this moment and what happened to me at MWCI with cos; I fear for my safety & security and Im vindictive. I don't want to socialize with inmates or C/Os. No exception. I'm not doing any AS programs or other. Ill speak with you all if need too as required.

*Id.* ¶ 121.

On October 8, 2019, Dr. Clements increased Plaintiff's Gabapentin. *Id.* at ¶ 122.

On October 14, 2019, Plaintiff submitted an inmate request form stating he had severe indigestion and an upset stomach. *Id.* ¶ 123.

The same day, Plaintiff submitted a separate inmate request form indicating that his stomach problems may have resulted from a nurse removing his Gabapentin from the capsule before administering it to him. *Id.* ¶ 124.

On October 16, 2019, Plaintiff was seen in the medical unit for his complaint of upset stomach and demanded to be seen by a medical provider. *Id.* ¶ 126.

On October 17, 2019, Plaintiff received a response that his appeal dated September 7, 2019 complaining about medical staff failing in their duties and being in "cahoots" with DOC staff to cover up excessive force by failing to document injuries and filing false reports was "compromised" for the stated reason that "[r]ecords, once recorded in a health record, cannot be removed. The only legal way is through the form given to you. This will be included in your health record." *Id.* ¶ 127.

On October 31, 2019, LPC Clark met with Plaintiff and reported that Plaintiff felt "like [he was] being messed with because [he] got a ticket" and that he did not "want to go to Garner" because he did not "feel safe being in an open environment[.]" *Id.* ¶ 128. Clark indicated that he worked on helping Plaintiff to develop "insight into the connection between historical trauma and feelings of insecurity, hypervigilance and views of the world that are shaped historical trauma and environment [sic]." *Id.*

On October 31, 2019, Plaintiff filed an inmate request to Dr. Mueller, stating that he should not be placed in general population, as his safety and security and "others are at risk" because he intended to protect himself "from any and all threats[.]" *Id.* ¶ 129. Plaintiff added his belief "that DOC is trying to and is going to retaliate because of PREA Complaint and my statement to State Police about said incident involving corr. Officers assaulting me on May 30, 2019 . . . ." *Id.* Plaintiff indicated that he would do what he had to do to protect himself by "any means necessary." Med. R. Pt. 2 at 35–36.

On November 14, 2019, Dr. Mueller conducted a Mental Health Evaluation of Plaintiff, which states:

> Reported that he frequently thinks about the incident at MacDougall that brought him here and has vindictive thoughts about it. Mood euthymic with appropriate affect. TP logical and coherent with no psychotic symptoms evident or reported. Inmate reported that he experienced periodic lapses in ST memory and

concentration when he is thinking about bad things that happened to him in the past. No problems in these areas evident during the interview. We discussed his current coping strategy of staying in his cell and avoiding interaction with others in order to prevent any possible conflict that may occur if he were to encounter a sign of disrespect from someone. He said he knows that he gets ragefully angry very quickly and does not want to risk a confrontation. He is trying to be reasonable and control his urge to retaliate but he will not hesitate to maintain his boundaries and reputation if provoked. "I just want to be left alon[e.]" He is willing to work with mental health services on coping skills but will only meet on an individual basis. No other concerns at this time.

Defs.' Rule 56(a) ¶ 130.

On November 20, 2019, Connecticut State Trooper Pirog met with Plaintiff to serve an active arrest warrant for assault on three peace officers in connection with the events of May 30, 2019. *Id.* ¶ 131. Plaintiff was then arrested, and the Connecticut State Police closed the May 30, 2019 investigation. *Id.* ¶¶ 133–34.

On December 2, 2019, LPC Clark continued Plaintiff's treatment plan for depression. *Id.* ¶ 135. On December 11, 2019, Mueller met with Plaintiff cell-side and recorded the following observations:

Initially very angry and expressing frustration that plans for his future status have not been solidified already. After some conversation inmate calmed and was able to communicate his priorities. He stated that he needs to have a single cell going forward unless he is able to make progress on his vindictive anger issues at some point in the future. He thinks that Special Needs status would be useful but if that is not an option he would at least like a guarantee of single cell status until he is ready to have a cell mate. He does not want to be transferred to another facility for progression to other phases. He also reported that he would like to discuss medication to help keep him calm and even out his tendency to get ragefully angry very quickly with little warning. He is motivated to work toward tolerating interaction with others and agreed to work individually with MHU toward this goal. He will not officially sign off on or participate in [Administrative Segregation] groups or programming due to his pending lawsuit regarding his original placement in AS. He feels that he cannot show any willingness or acquiescence to being on AS status because it will negatively affect his lawsuit. He is also very wary of being around others for extended periods due to his tenuous impulse control. Thus he tends to isolate in his cell most of the time. Inmate did not repo[r]t SI/HI/AVH. Alert and oriented x 3. Mood irritable with restricted affect initially but calmed with

conversation, TPO logical and coherent with no psychotic symptoms evident or reported. No other concerns at this time.

*Id.* ¶ 137.

On December 12, 2019, Plaintiff refused to meet with LPC Clark for a mental health individual session. *Id.* ¶ 138.

On December 20, 2019, Plaintiff saw Dr. Santiago Rodriguez, the orthopedic surgery resident, about potential surgery for his Achilles tendon rupture in 2018. *Id.* ¶ 139. Dr. Rodriguez recommended "daily strengthening exercises with right single heel raises; right ankle soft brace for support and follow up as needed." *Id.* ¶¶ 140–41.

On December 21, 2019, Dr. Mueller met with Plaintiff and wrote a medical note stating that Plaintiff "reported that he is easily and often triggered into negative thought patterns that sometimes spiral into violent thoughts and actions. He is looking to curb these negative patterns and hopes that medication and MH services can assist." *Id.* ¶ 141.

## II. STANDARD OF REVIEW

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.*

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). If the initial burden is satisfied, the burden then shifts to the nonmoving party to present "specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d

42, 44 (2d Cir. 2015) (internal quotation marks and citation omitted). While the Court must view the record in the light most favorable to the nonmoving party, and resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, *see Anderson*, 477 U.S. at 255, the nonmoving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must support each assertion disputing the veracity of a fact or existence of an alleged dispute with a specific citation to the evidentiary record. *See* Fed. R. Civ. P. 56(c)(1).

Because Plaintiff is proceeding pro se, the Court must read his submissions "liberally" and interpret them "to raise the strongest arguments" that they suggest. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). Nonetheless, "[p]roceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions[,] unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (internal quotation marks omitted).

## III. DISCUSSION

Defendants argue that Plaintiff has failed to exhaust his administrative remedies under Administrative Directive 9.6 on his following claims:

- **<u>Eighth Amendment excessive force claims</u>** against the custody staff defendants based on improper decontamination, use of in-cell restraints when posing no resistance or threatening behavior, and force by way of sexual assault; and

- **<u>Eighth Amendment medical indifference claims</u>** against the medical defendants under Administrative Directive 8.9 for improper or delayed decontamination; lack of medical treatment for his bruising, concussion, black eye, busted lip, and emotional distress;

falsification of records;[7] and Northern Nurse Supervisor Kilham's failure to investigate his complaint about RN Mushi's conduct[8] after the May 30, 2019 incident.[9] Defs.' Mem. at 33, 36.

Defendants argue further that Plaintiff cannot prevail, as a matter of law, on the merits of his Eighth Amendment excessive force and medical indifference claims or on his Fourteenth Amendment procedural due process claims.

The Court will first review Defendants' arguments concerning Plaintiff's failure to exhaust his administrative remedies.

## A. Exhaustion under the PLRA

The PLRA requires prisoners to exhaust available administrative remedies before filing a federal lawsuit regarding prison conditions. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). Section 1997e(a) applies to all claims regarding prison life, *Porter v. Nussle*, 534 U.S. 516, 532 (2002), and requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001).

---

[7] The Court notes that its initial review order dismissed as not plausible Plaintiff's claim in his Sixth Cause of Action that the medical defendants entered into "an inter-agency conspiracy to cover up and conceal the brutal beating by DOC officers against the Plaintiff and act in concert to falsify state records and falsify charged offenses against the Plaintiff to protect DOC staff." Initial Review Order 20 (citing Compl. ¶ 124).

[8] In his Complaint, Plaintiff alleges that he told RN Mushi about his injuries and need for decontamination and that he was having trouble breathing, but Mushi failed to assess Plaintiff's injuries and condition and falsified documentation to permit the use of the restraints that caused Plaintiff pain. *Id.* ¶¶ 66, 67, 68, 70. Plaintiff asserted further that Mushi examined the restraints but failed to correct their improper application. *Id.* ¶ 69.

[9] This Ruling also considers the merits of Plaintiff's claim against Kilham for supervisory liability or failure to correct her subordinates' conduct. *See* Compl. ¶ 87.

A claim is not exhausted until the inmate complies with all administrative deadlines and procedures. *See Woodford v. Ngo*, 548 U.S. 81, 90–93 (2006). A prisoner who does not complete the exhaustion process until after filing a federal lawsuit has not satisfied the exhaustion requirement. *See Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) ("Subsequent exhaustion after suit is filed therefore is insufficient."), *rev'd on other grounds*, *Porter*, 534 U.S. 516; *Gulley v. Bujnicki*, No. 3:19-cv-00903 (SRU), 2019 WL 2603536, at *3 (D. Conn. June 25, 2019). Courts have uniformly held, however, that the PLRA exhaustion requirement is satisfied where "prison officials address and resolve a grievance on the merits despite the fact that it might not comply with procedural rules." *Castillo v. Hogan*, No. 3:14-CV-1166 (VAB), 2018 WL 1582514, at *7 (D. Conn. Mar. 31, 2018) (citing cases). "The rationale for this requirement is that 'when a state treats a filing as timely and resolves it on the merits . . . the grievance has served its function of alerting the state and inviting corrective action.'" *Id.* (citing *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004)).

The exhaustion requirement may be excused when a remedy is not available in practice even if it is "officially on the books." *Ross v. Blake*, 578 U.S. 632, 642–44 (2016). This means that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 642 (quoting *Booth*, 532 U.S. at 738). The United States Supreme Court has established three kinds of circumstances in which an administrative remedy might be unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates[;]" (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use[;]" or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643–44. "Whether an administrative remedy was available to a prisoner

in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

Failure to exhaust administrative remedies is an affirmative defense. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Thus, the defendant bears the burden of proving that an inmate did not exhaust his or her remedies prior to filing the action in court. *See Johnson v. Mata*, 460 Fed. App'x 11, 15 (2d Cir. 2012) ("The defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment."). Although the defendant bears the burden on this affirmative defense at all times, the plaintiff may still have to adduce evidence in order to defeat a motion for summary judgment. *See Hudson v. Kirkey*, No. 920CV0581 (LEK/DJS), 2021 WL 1966721, at *3 (N.D.N.Y. May 17, 2021) (explaining that once defendant introduces evidence of a functional grievance system, plaintiff could not survive summary judgment without submitting competent evidence to indicate unavailability). While it is defendants' burden to establish that a plaintiff failed to meet the exhaustion requirement, the plaintiff bears the burden of demonstrating that such a process was unavailable. *Brooks v. Mullen*, No. 14-CV-6690-FPG, 2020 WL 6158614, at *5 (W.D.N.Y. Oct. 21, 2020) (citations omitted).

### 1.  Administrative Directive 9.6[10]

Administrative Directive 9.6 ("A.D. 9.6") "provide[s] a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority[.]" A.D. 9.6(1). A plaintiff with claims concerning custody staff's deliberate indifference to his health and safety in his conditions of confinement or use of excessive force is generally obligated to exhaust his administrative remedies under Administrative Directive 9.6. *See*

---

[10] Defendants have submitted the relevant version of Administrative Directive 9.6 as Exhibit 6, Doc. 55-7.

*Wilson v. McKenna*, 661 F. App'x 750, 753 (2d Cir. 2016) (affirming district court's dismissal based on inmate's failure to exhaust his claim against correction officer for deliberate indifference to medical needs under Administrative Directive 9.6); *Riles v. Buchanan*, 656 F. App'x 577, 581 (2d Cir. 2016) (affirming district court's dismissal based on inmate's failure to exhaust his claim of correction officer's use of excessive force under Administrative Directive 9.6). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Bock*, 549 U.S. at 218.

The relevant version of Administrative Directive 9.6(6) requires an aggrieved inmate to first seek informal resolution prior to filing a grievance. A.D. 9.6(6)(A). It provides that "the inmate shall submit a written request via CN 9601, Inmate Request Form" in the event that "the verbal option does not resolve the issue." *Id.* Administrative Directive 9.6(6)(C) specifically states that the inmate must include a copy of the Inmate Request Form (CN 9601) with the Grievance (CN 9602) or else explain its absence.

The Level-1 Grievance must be filed within thirty calendar days from the date of the occurrence or discovery of the cause of the Grievance and should include a copy of the response to the written request to resolve the matter informally or explain why the response is not attached. *See* A.D. 9.6(6)(C). The Unit Administrator shall respond in writing to the Level-1 Grievance within thirty business days of his or her receipt of the Grievance. *See* A.D. 9.6(6)(I). The inmate may appeal to Level-2 the disposition of the Level-1 Grievance by the Unit Administrator or the Unit Administrator's failure to dispose of the grievance in a timely manner. *See* A.D. 9.6(6)(G), (I) & (K). A grievance returned without disposition due to a failure to comply with the procedural requirements of Administrative Directive 9.6 may not be appealed. *See* A.D. 9.6(6)(G).

A Level-2 Grievance of a disposition of a Level-1 Grievance must be filed within five calendar days from the inmate's receipt of the decision on the Level-1 Grievance, and the Level-2 reviewer shall provide a written response within thirty business days of receipt of the Level-2 Grievance. *See* A.D. 9.6(6)(K). A Level-2 Grievance of the Unit Administrator's failure to dispose of the Level-1 Grievance in a timely manner must be filed within 65 days from the date the Level-1 Grievance was filed by the inmate. *See* A.D. 9.6(6)(M). Level-2 Grievances from inmates confined in Connecticut correctional facilities are reviewed by the appropriate District Administrator. *See* A.D. 9.6(6)(K).

Level-3 Grievances are restricted to challenges to department policy, the integrity of the grievance procedure, or Level-2 Grievances to which there has been an untimely response by the District Administrator. *See* A.D. 9.6(6)(L). A Level-3 Grievance must be filed within five calendar days from the inmate's receipt of the decision on the Level-2 Grievance. *See id.* A Level-3 Grievance of the District Administrator's failure to dispose of the Level-2 Grievance in a timely manner must be filed within 35 days of the filing of the Level-2 Grievance. *See* A.D. 9.6(6)(M). A Level-3 Grievance is reviewed by the Commissioner of Correction or his or her designee. *See* A.D. 9.6(6)(L).

Plaintiff asserts that he did exhaust all of administrative remedies under Directive 9.6. *See* Pl.'s Decl., Doc. 60-1, at 33 ¶ 1. Defendants acknowledge that Plaintiff filed a timely Level 1 Grievance to complain about correctional officer use of excessive force on May 30, 2019, which stated:

> This grievance is in regards to correctional officers not following protocol and procedures in extracting inmate from cell & on the use of force to restrain and secure inmate concerning incident that took place in MacDougall O-Unit 29-cell on May 30, 2019 at approx. 8:15 p.m. and outside cell in route to RHU. A C/O Foutain entered Cell 29 while inmate was present in cell alone & naked. C/O entered cell without supervising officer & or video camera present. He came in the cell with the

intent to assault me because he came in swinging his fist striking me several times before I restrained his hands and he slipt on clothing. Other C/Os responded and joined in the assault on my person. I recognized C/O Petterson run into cell after other unknown C/O was choking me from behind. Petterson starts to punch me in the face while other C/O held my neck and right arm behind my back then officer Petterson started punching me in my ribs left side under my left "pectoral" several times as if to brake them. Other C/Os came into cell and continued to assault and batter me as I was turned on my stomach with hands secure oc spray was applied to my face, and then I was sexually assaulted in my anus by someone with their finger while I was still being assaulted with hands and feet. Then oc spray was activated on my genitals and anus area. And while in route to RHU I was slammed against wall wrist twisted so as to brake. I want all officers involved terminated from Job: DOC.

Defs.' Rule 56(a) ¶ 86. After this grievance was denied, Plaintiff filed a Level-2 Grievance complaining about correctional staff entering his cell "to do bodily harm to [his ] person . . . to abuse [him] with excessive force & sexual assault." *Id.* ¶ 100, 105. Plaintiff's appeal was denied before he filed this action in federal court. *Id.* ¶ 112.

A plaintiff need not specifically articulate his claims in his grievances in the exact manner as his claim in federal court, but his grievances must provide notice to the defendants about the factual basis of his claim. *Espinal v. Goord*, 558 F.3d 119, 127–28 (2d Cir. 2009). As the United States Supreme Court explained in *Woodford*:

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).

548 U.S. at 90 (citation and internal quotation marks omitted) (emphasis in original). The Supreme Court has also clarified that the PLRA does not impose a requirement for an inmate to name all defendants in the grievance. *See Jones*, 549 U.S. at 217.

Here, Plaintiff's Level 1 and 2 Grievances do not name all of the defendants allegedly involved in the assault on Plaintiff, but his grievance filing provided DOC with a fair opportunity to adjudicate his claims of misuse of force due to DOC correctional staff physically and sexually assaulting him and exposing him to a chemical agent during his cell extraction and restraint on May 30, 2019. Plaintiff's exhaustion of his administrative remedies through his Level 2 Grievance expressed his concerns about use of excessive force to do bodily harm and sexual assault within the cell (which construed broadly extends to the use of a chemical agent by correctional staff).

Plaintiff's grievance filings did not, however, encompass his other Eighth Amendment claims about the application of in-cell restraints and inadequate decontamination, which both implicate separate factual predicates from that asserted in his exhausted grievance filing about correctional staff entering his cell with "to do bodily harm to [his] person . . . to abuse [him] with excessive force & sexual assault." *See* Defs.' Rule 56(a) ¶ 105. Thus, Plaintiff's exhausted claims in his grievance filing failed to afford DOC an opportunity to adjudicate his complaints against correctional staff who were involved with applying in-cell restraints and who allegedly failed to provide Plaintiff with adequate decontamination.

Defendants have submitted a grievance log reflecting that Plaintiff did not submit other grievances under Directive 9.6 arising from correctional staff conduct on May 30, 2019 concerning decontamination or the use of in-cell restraints. Defs.' Ex. 7, Doc. 55-9, at 7. Thus, it is clear that Plaintiff was able to file Level-1 and -2 Grievances under Administrative Directive 9.6, and the evidentiary record provides no suggestion that Plaintiff could not have fully exhausted his claims about application of in-cell restraints or inadequate decontamination due to the unavailability of his administrative remedies as contemplated by *Ross*.[11] Thus, it is undisputed that Plaintiff had

---

[11] This record includes Plaintiff's affidavit and his grievances attached to his opposition. Pl.'s Aff., Doc. 60-1, at 33–34; Grievances, Doc. 60-1, at 74–91.

access to his administrative remedies under Directive 9.6 and had the ability to satisfy all of the steps under Administrative Directive 9.6. *See* Defs.' Rule 56(a) ¶¶ 86, 105; *Nickelson v. Annucci*, 9:15-CV-00227 (GTS/TWD), 2018 WL 7269856, at *8 (N.D.N.Y. Nov. 21, 2018) (holding that inmate was not unaware of the prison's grievance procedure because, in part, he had filed and appealed previous grievances).

Accordingly, on the present record, Defendants have demonstrated that Plaintiff failed to exhaust his administrative remedies on his claims against the correctional staff defendants concerning application of in-cell restraints and their alleged failure to provide Plaintiff with adequate decontamination after his exposure to the chemical agent. The Court will grant the motion for summary judgment on Plaintiff's Eighth Amendment claims against the correctional staff defendants arising from application of the in-cell restraints and inadequate chemical agent decontamination.

### 2. Administrative Directive 8.9[12]

Because Plaintiff's claims against medical staff concern deprivations arising from the provision of health services, Plaintiff was required to exhaust his administrative remedies under DOC Administrative Directive 8.9, which governs the administrative remedies for health services. The relevant version of Administrative Directive 8.9 provides for two types of Health Services Review:

A. "Diagnosis and Treatment. A review of a diagnosis or treatment including a decision to provide no treatment[;]" and

B. "Review of an Administrative Issue. A review of a practice, procedure, administrative provision or policy, or an allegation of improper conduct by a health services provider."

---

[12] Defendants have submitted the relevant version of Administrative Directive 8.9 as Exhibit 10, Doc. 55-12.

A.D. 8.9 § 9.

Pursuant to Section 10 of Directive 8.9, both types of Health Services Review require an inmate to seek informal resolution of "the issue face to face with the appropriate staff member or with a supervisor via written request utilizing CN 9601 Inmate Request Form." A response to the inmate shall be made within fifteen days of the written request.

An inmate who is dissatisfied with a diagnosis or treatment may apply for a Health Services Review "if the informal resolution via inmate request was unsuccessful." *Id.* § 11. The inmate must check the Diagnosis/Treatment box on the form (CN 9602), explain concisely the cause of dissatisfaction, and deposit the form in the Health Services Remedies/Review box. *Id.* Upon receipt of CN 9602, the Health Services Review Coordinator shall schedule a Health Services Review Appointment with the appropriate health care provider. *Id.* § 11(A). If the physician decides that the existing diagnosis or treatment is appropriate, the inmate shall have exhausted the Health Services Review. *Id.* The physician shall notify the inmate of the decision, in writing, within ten business days by indicating "No Further Action" in the disposition field. *Id.* "If the physician decides that a different diagnosis or treatment is warranted, he/she may either (1) act on his/her decision; or, (2) refer the case to the [URC] for authorization by indicating 'Change of Treatment' or 'Referred to URC' as appropriate[.]" *Id.* § 11(B).

An inmate may request review of an Administrative Issue by checking the box marked "All Other Health Care Issues" on the Health Services Review form (CN 9602); provide a concise statement of what the inmate believes to be wrong and how the inmate has been affected; and deposit the form in the Health Services box. *Id.* § 12. This request for review shall be evaluated by a Health Services Review Coordinator within thirty days. *Id.* § 12(A). If the inmate is dissatisfied with the response, the inmate may appeal the decision within ten business days. *Id.* § 12(B). The

appeal is decided and responded to by the designated facility health services director or designee within fifteen days. *Id.* § 12(C). For all issues relating to compliance with existing standards, this review is final, and the inmate shall have exhausted the requisite Health Services Review process. *Id.* If the matter "relates to a health service policy of the Department, the inmate may appeal to the DOC Director of Health Services" within ten business days from the receipt of the response. *Id.* § 12(D). The Director has thirty days to respond. *Id.* § 12(E). Upon receipt of this decision, the inmate will have exhausted the Health Services Review for administrative issues. *Id.*

On initial review, I permitted Plaintiff's claims of Eighth Amendment medical indifference to proceed against RNs Mushi, Lembrick, and Scott and Nurse Supervisor Kilham for failure to ensure Plaintiff's proper decontamination after his chemical exposure; and against RNs Mushi, Lembrick, and Scott and Warden Mudano for failing to provide Plaintiff with medical treatment for injuries including bruises, a concussion, a black eye, a busted lip, neck and back injuries, a tear to his anus, reinjury to his Achilles tendon, lacerations, nerve damage to his right hand, emotional and mental distress, and chemical burning from the chemical agent exposure. Initial Review Order, Doc. 11, at 12–13. In asserting his claims of indifference due to lack of medical treatment, Plaintiff alleged that RNs Lembrick and Scott falsified records about his injuries and that Warden Mudano and Nurse Supervisor Kilham failed to ensure he received treatment. Compl. ¶¶ 76–77, 82–83, 85, 92.

Defendants argue that Plaintiff failed to exhaust all of his remedies under Directive 8.9 for his medical claims based on improper decontamination and lack of medical treatment for his bruising, concussion, black eye, busted lip, emotional distress, RN Lembrick's or other medical staff's failure to properly record his injuries, and Nurse Supervisor Kilham's failure to investigate his claims against RN Mushi. Defs.' Mem. at 36.

In his Health Services Review dated June 13, 2019, Plaintiff claimed that he had not received diagnosis or treatment for injuries sustained during the May 30, 2019 incident at MacDougall. Defs.' Ex. 11, Doc. 55-13, at 16. Plaintiff mentions specifically his damaged ribs, nerve damage, an assault to his genital area, continuing pain, and injured "left foot ankle" and wrist due to a gash and bruises from his cuffs. *Id.* Plaintiff asserted a demand for proper treatment including an MRI. *Id.* Dr. Clements responded on July 2, 2019, noting that an unspecified change was made to Plaintiff's treatment plan. *Id.* Dr. Clements also checked a box labeled, "You have exhausted DOC's Administrative Remedies[,]" and did not check the box indicating that the "matter may be appealed[.]" *Id.*

On July 16, 2019, Plaintiff filed another Health Services Review, complaining that he was in pain after the May 30, 2019 assault; that he had pain in his throat, "feet ankle," rib cage, wrist, and hands; and that his right hand specifically "has nerve damage that [he had been] informed of and has yet to be diagnosed." *Id.* at 14. Plaintiff demanded proper medical care for these conditions. *Id.* Dr. Clements responded on August 13, 2019, indicating that orthopedic and neurological appointments had been submitted, and that medication and "follow-up wrists" had been ordered. *Id.*

Plaintiff filed another Health Services Review dated July 27, 2019, complaining that RN Scott made a false medical report to cover up deliberate indifference and excessive force. *Id.* at 10. He asserted that he had made his need for medical attention clear upon intake at Northern for his "left foot ankle," "both [his] hands and wrist," and left ribs. *Id.* He received a disposition that his Health Services Review was denied on September 4, 2019, with instruction that he needed to provide a completed Form HR 3034. *Id.* His subsequent appeal, dated September 17, 2019, complained about medical staff's failure to properly examine him, failure to document his injuries, and

filing false reports. *Id.* at 8. An October 17, 2019 disposition stated that his claim was "compromised," and that he would be permitted to file the Form HR 3034 for inclusion in his medical records.[13] *Id.* The Grievance Appeal form indicated that Plaintiff had exhausted his administrative remedies. *Id.*

The record reflects that Plaintiff did raise his complaints about bruising on his wrists in a June 13, 2019 Health Services Review. *Id.* at 16. However, Defendants have submitted evidence, including grievance log entries, to substantiate their assertion that Plaintiff failed to satisfy all of the steps required by Directive 8.9 before filing the instant complaint. *See* Defs.' Ex. 11, Doc. 55-13, at 5–6. This is so because his prior Health Services Reviews failed to provide notice that Plaintiff needed or had been denied treatment for such conditions. *See id.* Moreover, there is no indication that Plaintiff filed any administrative remedy complaining about Nurse Supervisor Kilham's failure to investigate his complaints about RN Mushi's alleged misconduct. Accordingly, Plaintiff failed to afford the DOC officials an opportunity to adjudicate his complaints regarding his medical treatment prior to presenting his Eighth Amendment claims to federal court.

Defendants do not appear to argue that Plaintiff failed to exhaust his remedies under Directive 8.9 for his claim of medical record falsification against RN Scott. Defs.' Mem. at 36. However, the record shows that Plaintiff filed no Health Services Review that provided notice about Lembrick's (or any other specific defendant's) alleged failure to properly document his medical needs in the record. *See* Defs.' Ex. 11, Doc. 55-13.

---

[13] Plaintiff attached a form asserting that RN Scott "never examined me. A legitimate report would reflect all of my injuries I received from 5/30/2019 from excessive force." *Id.*

The record, which reflects that Plaintiff was able to file administrative remedies under Administrative Directive 8.9, raises no suggestion that Plaintiff's administrative remedies were unavailable to him as contemplated by *Ross*.[14] *See id.*

Thus, Defendants have satisfied their burden of showing nonexhaustion under Directive 8.9. The Court will grant Defendants' motion for summary judgment due to nonexhaustion under Directive 8.9 for Plaintiff's Eighth Amendment medical indifference claims of inadequate or delayed decontamination; lack of medical treatment for a concussion, black eye, and busted lip; lack of mental health treatment for his emotional distress;[15] failure to properly record his injuries by RN Lembrick or by any medical defendant other than Scott; and Nurse Kilham's failure to investigate his complaints about RN Mushi's conduct at MacDougall on May 30, 2019.

### B. Merits of Plaintiff's Claims[16]

Defendants argue that Plaintiff cannot prevail on the merits of his Eighth Amendment excessive force and medical indifference claims and his Fourteenth Amendment procedural due process claim.

---

[14] This record includes Plaintiff's affidavit and his relevant medical grievances attached to his opposition. *See* Pl.'s Aff., Doc. 60-1, at 33–34; Medical Grievances, Doc. 60-1, at 93–106).

[15] To the extent that Plaintiff's use of the word "anguish" in his July 16 Health Services Review may be considered to support a claim of exhaustion regarding his mental health needs, such claim fails because the medical record manifests that Plaintiff received adequate mental health treatment. *See* Defs.' Rule 56(a) ¶¶ 50, 59, 70, 90, 97, 103, 111, 115–116, 118, 128, 130, 136–137, 141. Plaintiff has not explained how any defendant acted with deliberate indifference to his mental health needs. At most, a claim that medical providers erred in providing him mental health treatment reflects his disagreement with the medical providers' decisions regarding his mental health treatment, which is insufficient to support a constitutional claim. *See Hathaway v. Coughlin*, 37 F.3d 63, 70 (2d Cir. 1994) ("We do not sit as a medical board of review. Where the dispute concerns not the absence of help but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.").

[16] The Court notes that Defendants have not moved for summary judgment on the basis of qualified immunity.

### 1. Eighth Amendment Excessive Force

The Eighth Amendment protects against punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). In *Hudson v. McMillian*, 503 U.S. 1 (1992), the Supreme Court established the minimum standard to be applied in determining whether force by a correctional officer against a sentenced inmate states a constitutional claim under the Eighth Amendment in contexts other than prison disturbances. When an inmate claims that excessive force has been used against him or her by a prison official, he or she has the burden of establishing both an objective and a subjective component to his claim. *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000); *see also Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

To meet the objective component, the inmate must allege that the defendant's conduct was serious enough to have violated "contemporary standards of decency." *Hudson*, 503 U.S. at 8 (internal quotation marks and citation omitted). A de minimis use of force will rarely be sufficient to satisfy the objective element unless that force is also "repugnant to the conscience of mankind." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (quoting *Hudson*, 503 U.S. at 9–10 (internal quotation marks omitted)). However, it is the force used, not the injury sustained, that "ultimately counts." *Id.* at 37–38 ("core judicial inquiry" is "not whether a certain quantum of injury was sustained," but rather whether unreasonable force was applied given the circumstances). A malicious use of force constitutes a *per se* Eighth Amendment violation because in such circumstances, "contemporary standards of decency are always violated." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citations omitted); *see also Hudson*, 503 U.S. at 9 ("[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated" irrespective of whether significant injury is present).

The subjective component requires the inmate to show that the prison officials acted wantonly and focuses on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The court considers factors including "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* (internal quotations and citation omitted).

Defendants argue that they are entitled to entry of summary judgment because the use of force was justified, and they did not use force in a malicious or sadistic manner or use an unreasonable amount of force in response to Plaintiff's conduct. Defs.' Mem., Doc. 55-1, at 11–12. Defendants represent that it is undisputed that Plaintiff refused to comply with orders to exit his cell and instead removed his clothing, which made it more difficult for the defendants to secure Plaintiff. *Id.*; *see* Defs.' Rule 56(a) ¶ 73; Defs.' Ex. 9, Doc. 55-11, at 9 (Plaintiff's Statement for Advisor Report). Defendants assert that they "perceived this act as aggressive" and, therefore, responded by using their fists and a chemical agent spray to control Plaintiff and secure him with wrist restraints. *Id.* at 11.

Defendants have submitted video evidence in support of their assertion that no misuse of force occurred. There are multiple videos, which have been reviewed in Chambers. Where the parties present conflicting versions of an incident and video evidence of the incident has been submitted on a motion for summary judgment, the court must view the facts "in the light depicted" by the video of the incident. *See Scott v. Harris,* 550 U.S. 372, 380–81 (2007). The first surveillance video evidence, MAC-VP-19-589, consists of two videos ("Video One A" and "Video One B") recorded by cameras stationed at a high location in the prison facility room at opposite sides

of the room. Video One A shows two correctional staff members approach Plaintiff's cell, an in-
mate (presumably Plaintiff) exit the cell, and one correctional staff member remain outside of the
cell while the other enters the cell. *Id.* 57:13–58:00. A correctional officer later exits the cell to
place a bag on the ground outside of the cell, and an inmate using a cane (presumably Plaintiff)
can be seen entering the cell. *Id.* 1:05:54–1:06:09. Thereafter, the video depicts other correctional
staff arriving, entering the cell, a chair from inside the cell landing on the ground as if thrown from
inside of the cell, and numerous other correctional staff running and entering the cell, and the
inmates at the tables returning to their cells. *Id.* 1:06:44–1:10. Plaintiff can later be seen being
escorted backwards out of the cell. *Id.* 1:11:22–1:11:53. Video One B shows correctional staff
entering and running across the room and Plaintiff's reverse escort. Video One B 1:06:35–1:12:01.

    Another video, MAC-VP-19-591 ("Video Two"), commences after the alleged use of ex-
cessive force that occurred within the cell interior. Video Two indicates that Plaintiff coughed as
a result of the chemical agent exposure, communicated that his wrist hurt as he was being escorted
from his cell to the RHU, was provided with some decontamination, and was placed in in-cell
restraints that were assessed by an RN (presumably RN Mushi). *See* Video Two.

    These videos do not contradict the core of Plaintiff's account of an assault in his cell. *See*
Compl. ¶¶ 41–58. Videos One A and One B contain no sound and do not depict the correction
officers' response within the cell. Likewise, Video Two provides no footage of any events during
the alleged use of excessive force in Plaintiff's cell.[17] Plaintiff alleges that after Gifford, Russell,
and Rivenburgh assaulted him and forced him onto his stomach on the floor, the following hap-
pened: LaMountain digitally penetrated his anus; Mihaliak sprayed a chemical agent in his face
although Plaintiff was already in restraints; Legassey sprayed a chemical agent on Plaintiff's anus

---

[17] Likewise, Video Three is not relevant to whether excessive force occurred within the interior of the
cell because it only depicts Plaintiff sitting in a cell before his transfer to Northern. *See* Video Three.

and genitals; Peterson and Brown continued to strike and knee his legs; Gifford choked him; and LaMountain, Rivenburgh, and Russell struck him. Compl. ¶¶ 50-57; *see also* Pl.'s Decl., Doc. 60-1, at 14–20. Plaintiff alleges that he briefly lost consciousness as a result of the force applied. Compl. ¶ 58. The videos, however, do not show any of the events that allegedly occurred in Plaintiff's cell, and are therefore of limited probative value. Thus, the video evidence fails to support, as a matter of law, Defendants' assertion that the responding correctional staff applied force consistent with contemporary standards of decency for legitimate penological reasons.

Plaintiff admits that he was holding his wooden cane and ignored the correctional staff's instruction to exit his cell. Defs.' Ex. 8, Doc. 55-10, at 11–12 (Plaintiff's statement to Connecticut State Police). Defendants also claim that Plaintiff lacks evidence to substantiate his claim of a sexual assault, since he refused to permit an evaluation of his genital area, according to his medical records. Med. R. Pt. 1 at 37–43.

The present record leaves multiple factual questions in genuine dispute. Specifically, questions remain as to whether Defendants' use of force violated contemporary standards of decency, and whether force was applied in a good-faith effort to restore discipline. In considering a motion for summary judgment, the Court cannot render credibility assessments, which are reserved for the jury. *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 2017) ("Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.").

Accordingly, the Court must deny the motion for summary judgment as to Plaintiff's remaining Eighth Amendment excessive force claims based on his physical and sexual assault and chemical spraying by Defendants Correction Officers Gifford, Russell, LaMountain, Rivenburgh, Peterson, Brown, and Briatico, and Lieutenants Mihaliak and Legassey. For the same reasons—

namely, the existence of multiple genuine factual questions regarding the incident in Plaintiff's cell—Plaintiff's related state law claim of assault and battery also survives this motion for summary judgment.

### 2. Eighth Amendment Medical Deliberate Indifference

The Court considers next whether Defendants' motion for summary judgment should be granted on Plaintiff's remaining Eighth Amendment claims of deliberate indifference to his medical needs—specifically, his bruises, neck and back injuries, lacerations, "foot ankle" or Achilles tendon injury, wrist pain, and nerve damage. *See* Compl. ¶ 72.

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." *Id.* at 104 (internal quotation marks and citation omitted). The Court explained that "[t]his is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05.

To state a claim for deliberate indifference to a serious medical need, a plaintiff's claim must satisfy both objective and subjective elements. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). First, the alleged deprivation "must be, in objective terms, sufficiently serious." *Id.* (quotations and citations omitted). "Second, the charged official must act with a sufficiently culpable state of mind." *Id.*

Under the objective prong, the inmate's medical need or condition must be "a serious one." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of

comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted). Moreover, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

To satisfy the second subjective prong, a prison official or medical staff member must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. *See Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Mere negligent conduct does not constitute deliberate indifference. *See Salahuddin*, 467 F.3d. at 280 ("[R]ecklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent."). *See also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir. 2003) (medical malpractice alone does not amount to deliberate indifference).

Nor does a disagreement over proper treatment or diagnosis create a constitutional claim so long as the treatment was adequate. *Estelle*, 429 U.S. at 107; *Chance*, 143 F.3d at 703; *see also Oh v. Saprano*, No. 3:20-CV-237 (SRU), 2020 WL 4339476, at *5 (D. Conn. July 27, 2020) ("[I]t is well settled that an inmate's unheeded preference for treatment does not create a constitutional claim."). However, a medical provider may act with deliberate indifference by consciously providing an inmate with "an easier and less efficacious" treatment plan, particularly if the provider does so because of ulterior motives, such as improper monetary incentive. *Chance*, 143 F.3d at 703–

04; *see also Braham v. Perelmuter*, No. 3:15-cv-1094 (JCH), 2017 WL 3222532, at *16–17 (D. Conn. July 28, 2017).

"In cases where a prisoner alleges a delay in medical treatment, courts examine both the seriousness of the prisoner's medical conditions and the harm caused by any unreasonable delay." *Lombardo v. Graham*, 807 F. App'x 120, 123 (2d Cir. 2020) (citing *Salahuddin*, 467 F.3d at 280) (other citations omitted) (summary order). The court's objective "serious medical need inquiry can take into account the severity of the temporary deprivation alleged by the prisoner." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir. 2003). The court should consider the "particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition." *Id.* "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.*; *see also Bilal v. White*, 494 F. App'x 143, 145–46 (2d Cir. 2012) ("Even assuming that Bilal's conditions could produce serious complications if neglected over sufficient time, there is no evidence that Bilal's conditions worsened over the hours of delay here[.]") (internal citation omitted); *see also Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) ("Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in [the Second] Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness.").

Relevant to the subjective component of the Eighth Amendment analysis, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. *See Salahuddin,* 467 F.3d at 280; *Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("A delay in medical treatment

does not by itself violate a prisoner's Eighth Amendment rights unless the delay reflects deliberate indifference to a serious risk [to] health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.").

Defendants argue that Plaintiff's conditions do not satisfy the objective component of the analysis. Generally, courts have concluded that minor injuries such as cuts, bruises, or soft tissue injuries are not conditions of urgency that may produce death, degeneration, or extreme pain, unless accompanied by more serious conditions such as profuse bleeding. *See Chatin v. Artuz*, 28 Fed. Appx. 9, 10–11 (2d Cir. 2001) (summary order) ("[Plaintiff]'s condition, which medical staff at various stages of his treatment diagnosed as a sprained ankle, a bone spur, and a neuroma, did not rise to the level of seriousness that the Eighth Amendment requires."); *Gonzalez v. Hannah*, No. 3:19CV1522(VLB), 2020 WL 3256869, at *6 (D. Conn. June 16, 2020) (implausible that inmate's cut was objectively serious where inmate failed to allege that his cut "bled, was deep or was painful."); *Young v. Choinski*, 15 F. Supp. 3d 172, 183 (D. Conn. 2014) (cuts and abrasions on plaintiff's arms failed to constitute a "serious medical need" where he failed to allege that they "significantly interfered with his daily activities or caused him substantial or chronic pain"); *Patterson v. Westchester Cty.*, No. 13 CIV. 0194 PAC AJP, 2014 WL 1407709, at *7 (S.D.N.Y. Apr. 11, 2014) ("Unlike cases where injuries demonstrate the requisite urgency leading to 'death, degeneration or extreme pain,' the case law holds that prisoner complaints about ligaments or other ankle problems do not establish the objective prong of the deliberate indifference standard."), *report and recommendation adopted*, No. 13 CIV. 0194 PAC AJP, 2014 WL 2759072 (S.D.N.Y. June 16, 2014); *Dallio v. Hebert*, 678 F. Supp. 2d 35, 60 (N.D.N.Y. 2009) (two black eyes, bruising in kidney area, kick marks, and open laceration on knees not serious medical condition); *Benitez*

*v. Straley*, No. 01 Civ. 0181(RCC)(RLE), 2006 WL 5400078, at *3–4, *12 (S.D.N.Y. Feb. 16, 2006) (cut on plaintiff's lips, cut on plaintiff's head, and "severe cuts" to plaintiff's wrists—none of which required stitches—did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment, even if plaintiff's allegations were assumed to be true); *Rodriguez v. Mercado*, No. 00-CV-8588, 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (bruises to head, back, and wrists sustained during excessive force incident not sufficiently serious).

On this evidentiary record, Plaintiff has demonstrated, at least, a genuine dispute of material fact as to whether he suffered from an injury that constituted a "serious medical need." Plaintiff's physical complaints included, in summary, the following:

- "left ankle pain[,]" "right rib pain[,]" and "[s]mall superficial laceration right wrist" (May 30, 2019), Defs.' Rule 56(a) ¶ 61;

- rib damage, left "foot ankle" injury, wrist gash and bruises from cuffs, nerve damage, and "assault" to his genital area (June 13, 2019), *id.* ¶ 76; Defs.' Ex. 11, Doc. 55-13, at 16;

- sore throat, pain when swallowing, and throat tender to the touch (June 15, 2019), Defs.' Rule 56(a) ¶ 80;

- worsening throat pain and difficulty swallowing (June 20, 2019), *id.* ¶ 82;

- x-ray of left wrist revealing suspect osteoarthritis (June 21, 2019), *id.* ¶ 83;

- sore throat, pain in wrist and hand believed to be nerve damage, and pain in rib and abdomen (June 30, 2019), *id.* ¶ 87;

- pain in rib, throat, and left foot ongoing since May 31, 2019 (July 2, 2019), Med. R. Pt. 1 at 18;

- throat pain, issues with "feet ankle[,]" left rib cage, wrist and hands (including possible nerve damage) (July 16, 2019), Defs.' Ex. 11, Doc. 55-13, at 14;

- pain in foot, sore throat, and numbness in right hand believed to be nerve damage (July 24, 2019), Defs.' Rule 56(a) ¶ 99;

- persistent numbness in right wrist (August 13, 2019), *id.* ¶¶ 107–08;

- "pain in [his] ankles, knee and back now" (October 2, 2019), *id.* ¶ 119; and

- severe indigestion and upset stomach (October 14, 2019), *id.* ¶ 123.

As the Second Circuit held in *Chance*, a court may consider whether a medical condition significantly affects "an individual's daily activities" or presents "chronic and substantial pain." 143 F.3d at 702. In *Young v. Choinski*, I addressed a claim involving self-inflicted abrasions to a plaintiff's arms, which had minimal bleeding, and which the plaintiff did not allege "significantly interfered with his daily activities or caused him substantial or chronic pain." 15 F. Supp. 3d at 183. These abrasions, I concluded, did not constitute an objectively serious medical need. *Id.* at 184.

In contrast, Plaintiff here has alleged and presented facts to support his complaints of persistent pain, over a period of at least three months, in his neck, wrist, hand, and ankles, as well as occasional pain in his knee, ribs, and back. Construing the evidentiary record most favorably to Plaintiff, the Court concludes that Plaintiff had serious medical conditions due to his continuing wrist, nerve damage, rib, neck, and tendon or "foot ankle" pain. *See* Med. R. Pt. 1 at 21, 22, 30, 33, 35; Med. R. Pt. 2 at 53–54, 73, 79, 80, 82–83, 93, 111, 115, 126, 129, 133, 169–71.

However, the record shows that Plaintiff received medical attention for these conditions. This treatment included appointments with medical professionals such as Dr. Clements and an orthopedic surgeon, Dr. Rodriguez, as well as diagnostic tests such as x-rays, explanations of the x-rays, and pain medication. Med. R. Pt. 1 at 3–6, 15–20, 31–32, 53–54, 72–74; Med. R. Pt. 2 at 12–15, 46–49, 51, 73–77, 79–80, 83, 89, 109, 124–125, 165. Moreover, after Plaintiff's first neck

x-ray was determined to be incomplete, Dr. Clements ordered a second neck x-ray that Plaintiff

later refused to undergo, and Plaintiff was seen by medical staff for his complaint about his asserted

adverse reaction to taking an open capsule of Gabapentin. *Id.* at 46–49, 70, 73–77.

Plaintiff has complained that he failed to receive an MRI for his wrist, foot, and ribs. Med.

R. Pt. 1 at 33; Med. R. Pt. 2 at 93; Defs.' Ex. 11, Doc. 55-13, at 16–17. Plaintiff's inmate requests

and Health Services Reviews reflect his dissatisfaction with the treatment provided to diagnose his

injuries and provide adequate pain medication. Med. R. Pt. 1 at 33, 93 (Doc. 54); Med. R. Pt. 2 at

48, 82–83 (Doc. 54-1); Defs' Ex. 11 (Medical Grievances) at 14 (Doc. 55-13). But a plaintiff's

disagreement with his medical provider about his medical treatment needs is not sufficient to sup-

port a claim of Eighth Amendment violation. *See Perry v. Furey*, No. 3:18CV1709 (KAD), 2020

WL 59941, at *6 (D. Conn. Jan. 6, 2020) ("The mere fact that the plaintiff believes he should have

been seen sooner or more frequently than he was does not create a deprivation of constitutional

dimension."); *Grays v. McGrain*, 333 F. Supp. 3d 225, 234 (W.D.N.Y. 2018) (citing cases finding

disagreement with treatment insufficient to establish basis of Eighth Amendment violation); *Wash-*

*ington v. Westchester Cty. Dep't of Corr.,* No. 13-CV-5322, 2014 WL 1778410, at *6 (S.D.N.Y.

Apr. 25, 2014) ("[I]t is well-settled that the ultimate decision of whether or not to administer

a treatment or medication is a medical judgment that, without more, does not amount to deliberate

indifference."); *see e.g., Estelle,* 429 U.S. at 107 ("[T]he question whether an X-ray or additional

diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical

judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and

unusual punishment. At most it is medical malpractice, and as such the proper forum is the state

court . . . ."). According to the medical record, Plaintiff's need for pain medication and diagnostic

tests were addressed; he has been assessed by physicians, including an orthopedic surgeon; and

medical staff has taken steps to address any deficiencies in the medical care by ordering a second neck x-ray and seeing him about his adverse reaction to an opened capsule of Gabapentin.[18] Even if a claim could be made that any defendant acted negligently with regard to Plaintiff's medical needs, negligent conduct does not constitute deliberate indifference in the context of an Eighth Amendment violation. *See Farmer*, 511 U.S. at 835.

Based on the present record, no reasonable jury could conclude that any defendant acted with deliberate indifference to Plaintiff's serious medical needs. Accordingly, the Court must grant the motion for summary judgment on Plaintiff's Eighth Amendment claim of deliberate indifference to his bruises, neck and back injuries, lacerations, Achilles tendon injury, foot and ankle pain, and wrist pain and nerve damage to his right hand.

Genital Assault

Defendants' motion for summary judgment does not specifically address Plaintiff's deliberate indifference claim arising from his need for treatment due to "an assault to his genitals" that was raised in his Health Services Review dated June 13, 2019. Defs.' Ex. 11 (Medical Grievances), Doc. 55-13, at 16–17. However, the present record shows that Plaintiff cannot prevail on this claim. The record indicates that on June 6, 2019, Plaintiff requested a cream for his genital area due to burning from a chemical agent spray, but on June 9, 2019, he refused to permit an assessment of his genital area by medical staff even in a private setting, despite being informed that his refusal would result in not receiving any ointment. Med. R. Pt. 2 at 130–33.

---

[18] Moreover, Plaintiff has not presented any evidence that he experienced any serious risk of harm as a result of any delay in receiving treatment for his injuries after the May 30, 2021 incident. *See Rodriguez v. Mercado*, No. 00-CIV-8588, 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002) (noting that patients "seeking care for a non-life-threatening injury generally experience[] some delay in receiving treatment" and finding no constitutional claim based on an eight- or nine-hour delay where plaintiff had not alleged "life-threatening" or "fast-degenerating conditions" or extreme pain that "more rapid treatment would have alleviated.").

To the extent that Plaintiff raises a claim of deliberate indifference to his medical needs for his genitals, the record shows that Defendants addressed this need shortly after Plaintiff's request for treatment and that Plaintiff's own conduct resulted in his failure to receive treatment. *Cf. Perry,* 2020 WL 59941, at *5 (noting plaintiff's claim of inadequate treatment failed "to account for his own role in the treatment he did and did not receive and does not create a genuine issue of material fact in any event."). Med. R. Pt. 1 at 37–40. Based on the present record, Plaintiff's claim of deliberate indifference to his need for treatment for his genitals fails and must be dismissed as not plausible under 28 U.S.C. § 1915(e)(2)(B)(i)–(iii).

### 3. Supervisory Liability Claims

Plaintiff asserts supervisory claims against Nurse Supervisor Kilham and Warden Mudano for violation of the Eighth Amendment. *See* Pl.'s Mem. at 14; Compl. ¶¶ 85, 87 (Plaintiff alleges that he spoke to Kilham about his request for treatment and RN Scott's failure to provide him with treatment, but Kilham allegedly took no action to correct subordinates' failures); *id.* ¶ 92 (Plaintiff alleges that he informed Warden Mudano about the assault, but she failed to secure him treatment and to "see to" his wellbeing). Defendants argue that Plaintiff cannot show that either Nurse Supervisor Kilham or Warden Mudano had personal involvement in the asserted Eighth Amendment violations as required for a damages claim under 42 U.S.C. § 1983. Defs.' Mem. at 24–26.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). To the extent that Plaintiff seeks to impose supervisory liability for damages on Defendants for failure to supervise their subordinates, such claims are not plausible in light of the Second Circuit's recent ruling requiring a plaintiff to "plead and prove the elements of the underlying

constitutional violation directly against the official without relying on a special test for supervisory liability" in order to hold a state official liable for damages under § 1983. *Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020). ("[I]t is not enough for [a plaintiff] to show that [a defendant] was negligent, or even grossly negligent, in her supervision of the correctional officers or in failing to act on the information she had.").

As an initial matter, both Kilham and Mudano, who were employed at Northern, were at no time involved with any Eighth Amendment deliberate indifference that occurred on May 30, 2019 at MacDougall.

To the extent that Plaintiff alleges that he made complaints about staff misconduct relevant to his treatment needs to Defendant Kilham and Warden Mudano, such allegations that a supervisor did not do enough *after* a constitutional violation has already occurred is not enough to show personal involvement of the supervisor in the violation of a prisoner's constitutional rights. *See Tangreti*, 983 F.3d at 616–19; *Lopez v. Chappius*, 6:17-CV-06305 EAW, 2021 WL 859384, at *2 (W.D.N.Y. Mar. 8, 2021) (noting that it is "well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find the defendant was personally involved in the deprivation alleged" and that "the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement of a supervisor in the denial of a constitutional right"). Moreover, the medical record does not substantiate Plaintiff's assertion that he lacked treatment responsive to his injuries, conditions, or mental health arising from the alleged assault by correctional staff at MacDougall.

As no reasonable juror could conclude that RN Kilham or Warden Mudano acted with deliberate indifference in any asserted Eighth Amendment violation, the Court will grant the

motion for summary judgment as to Plaintiff's Eighth Amendment supervisory claims against Nurse Supervisor Kilham and Warden Mudano.

### 4. Fourteenth Amendment Procedural Due Process

The Court's initial review permitted Plaintiff's Fourteenth Amendment procedural due process claim to proceed against Warden Mudano, Deputy Commissioner Quiros, Director Maiga, and Counselor Supervisor Tugie. IRO at 15–17, 22. Plaintiff alleged that his Administrative Segregation hearing was a mere "formality" because it was held prior to his disciplinary hearing on the alleged misconduct, resulted in his placement in Administrative Segregation before being adjudicated as guilty. Compl. ¶ 98.

The court must analyze a claim of violation of procedural due process by (1) asking whether there exists a liberty or property interest of which a person has been deprived, and (2) if so, whether the procedures followed by the State were constitutionally sufficient. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

In the prison context, a prisoner must show that he was subjected to an "atypical and significant hardship in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (prisoner subjected to a disciplinary term of thirty days' confinement in restrictive housing did not sustain a deprivation of a liberty interest for purposes of due process). The court must examine the actual punishment received, as well as the conditions and duration of the punishment. *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). "The inquiry into the severity of confinement assesses whether differences in conditions between a restrictive housing status and the general population or other restrictive statuses constitute a significant hardship." *Taylor v. Rodriguez*, 238 F.3d 188, 195 (2d Cir. 2001).

Defendants do not challenge Plaintiff's claim on grounds that he cannot establish a liberty interest. Instead, they argue that Plaintiff cannot establish a Fourteenth Amendment due process violation in connection with the decision to place Plaintiff in administrative segregation. Defs.' Mem. at 21–22.

The level of procedural protection required depends on the purpose of the hearing. *Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir. 1987). For an administrative proceeding, the inmate is entitled only to "some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding" the matter. *Hewitt v. Helms*, 459 U.S. 460, 476 (1983). In *Wilkinson v. Austin*, 545 U.S. 209, 229 (2005), the Supreme Court applied the standard set forth in *Hewitt* to a due process claim asserted by inmates who had been classified for indefinite placement in a high security state prison for safety and security reasons, rather than disciplinary ones.[19]

 "[T]he Supreme Court [has] described what process is due from prison officials making Ad[ministrative] Seg[regation] determinations." *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) (citing *Hewitt v. Helms*, 459 U.S. 460, 474 (1983), *abrogated in part on other grounds by Sandin*, 515 U.S. 472 (1995)). Because administrative segregation "is appropriate when necessary to incapacitate an inmate who 'represents a security threat' or to 'complet[e] . . . an investigation into misconduct charges[,]'" prison officials seeking to achieve one or both of those goals have "wide latitude in the procedures they deploy." *Id.* (quoting *Hewitt*, 459 U.S. at 476). Nevertheless, prior to placing a prisoner in administrative segregation, "prison officials must provide 'some notice of the charges against him and an opportunity to present his views to the prison official charged

---

[19] At a disciplinary proceeding, an inmate is entitled to advance written notice of the charge, adequate time to prepare a defense, a written statement of the reasons for the disciplinary action taken, and a limited opportunity to present witnesses and evidence in his defense. *Wolff v. McDonnell*, 418 U.S. 539, 561–70 (1974).

with deciding whether to transfer him to [administrative segregation],' although not necessarily a full hearing." *Id.* (quoting *Hewitt*, 459 U.S. at 476). As long as these two requirements are met, the non-adversary proceeding is held "within a reasonable time following the inmate's transfer" to administrative segregation, "and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied." *Hewitt*, 459 U.S. at 476, 476 n.8.

The decision to place an inmate in administrative or punitive segregation must also be based on "some evidence." *Brown v. Semple*, No. 3:16cv376(MPS), 2018 WL 4308564, at *12 (D. Conn. Sept. 10, 2018) (citing *Superintendent v. Hill*, 472 U.S. 445, 454 (1985). Second Circuit precedent clarifies that the some-evidence standard requires that the administrative decision be supported by some *reliable* evidence. *See Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir. 2001) (holding that prisoner's close custody designation must be supported by reliable evidence); *see also Elder v. McCarthy*, 967 F.3d 113, 129–30 (2d Cir. 2020) (explaining that disciplinary determinations must be supported by some reliable evidence). However, the final decision as to whether segregation is justified, may "'turn[] largely on purely subjective evaluations and on predictions of future behavior.'" *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 474).

Defendants explain that Plaintiff was transferred to Northern on May 31, 2019, pending determination of whether he should be placed on Administrative Segregation as a result of the May 30, 2019 incident. Defs.' Rule 56(a) ¶ 6; Defs.' Mem. at 21. It is undisputed that Plaintiff received notice of the June 14, 2019 classification hearing to determine whether he should be placed on Administrative Segregation as a result of the events on May 30, 2019. *See* Defs.' Rule 56(a) ¶ 69; *see* Defs.' Ex. 9 (Notification of Hearing), Doc. 55-11, at 8.

Plaintiff does not dispute that Hearing Officer Tugie received the following into evidence: Plaintiff's statement; Warden Barone's memorandum to Defendant Maiga recommending that

Plaintiff be placed in Administrative Segregation for safety and security reasons based on the May 30, 2019 incident; and photographs from the incident scene. *Id.* ¶ 79; *see* Defs.' Ex. 9 (Administrative Segregation Placement Records), Doc. 55-11.

The record, including the summary of the rationale for the Administrative Segregation placement on the Hearing Report, shows that Hearing Officer Tugie also considered evidence concerning correctional staff's shakedown of Plaintiff's cell and discovery of contraband; descriptions of Plaintiff's asserted conduct during the altercation and correctional staff's difficulty in restraining Plaintiff and gaining his compliance; medical records about the injuries to staff members; Plaintiff's eighty-one year sentence for aggravated sexual assault, conspiracy/attempt to commit robbery, and sale of hallucinogenic/narcotic substance; and Plaintiff's prison disciplinary history comprising fifty-one disciplinary reports, including five for threats, eight for assault, eight for disobeying a direct order, and seven for fighting. *See id.* at 4. After Tugie recommended Plaintiff's Administrative Segregation placement due to "direct and intentional assault of multiple assault DOC staff resulting in injuries," Defendant Maiga authorized the recommended placement on June 19, 2019. *Id.* at 5.

Fourteenth Amendment due process does not require that a disciplinary hearing occur prior to an administrative placement decision. *See Hewitt*, 459 U.S. at 476, 476 n.8; *Proctor*, 846 F.3d at 609. Nor does it require that the hearing officer consider all possible evidence, as a decision need only be supported by some reliable evidence. *Muniz v. Cook*, No. 3:20-CV-1533 (MPS), 2021 WL 1617162, at *3 (D. Conn. Apr. 26, 2021).

Here, the record reflects that the Administrative Segregation placement was supported by some reliable evidence, including medical and incident reports and Plaintiff's own criminal and

disciplinary history, which indicated that Plaintiff had a history of aggressive behavior and was likely to present a threat to institutional security.

Upon review of the present record, no reasonable jury could conclude that Plaintiff's Fourteenth Amendment procedural rights were violated in connection with the decision to place him in Administrative Segregation. The Court will grant the motion for summary judgment in Defendants' favor on Plaintiff's claim of a Fourteenth Amendment due process violation.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment, Doc. 55, is GRANTED in part and DENIED in part. The Court DENIES the motion for summary judgment on Plaintiff's Eighth Amendment excessive force claim and his related state-law claim of assault and battery, and GRANTS the motion for summary judgment on Plaintiff's claim of Eighth Amendment deliberate indifference to his medical needs, including his claims of supervisory liability, and on his Fourteenth Amendment procedural due process claims.

Under 28 U.S.C. § 1915(e)(2)(B)(i)-(iii), the Court DISMISSES on the merits his Eighth Amendment claims of indifference to his need for treatment for his genitals.

It is **SO ORDERED**.

Dated: August 4, 2022
New Haven, Connecticut

/s/ Charles S. Haight, Jr.
Charles S. Haight, Jr.
Senior United States District Judge